(No. 26974.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* HARLEY GRIZZEL, *et al.*, Plaintiffs in Error.

*Opinion filed January 21, 1943.*

12

HARRY I. HANNAH, THOMAS R. FIGENBAUM, and A. W. SCHIMMEL, for plaintiffs in error.

GEORGE F. BARRETT, Attorney General, and W. K. KIDWELL, State's Attorney, (KENNETH GREEN, of counsel,) for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Harley Grizzel, Norman Louis Farr, alias Louis Fawr, alias Frank Johnson, alias Frank Wittenbrink, alias Robert Cramer, and Thomas Fagin, alias Tommy Fagan, alias Herman Berlin, alias Herman Berlinda, hereinafter referred to as defendants, were indicted in the circuit court of Coles county, on a charge of assault with a deadly weapon on William Allen, with intent to commit murder. A motion to quash the indictment was filed by the defendants which was overruled by the court, whereupon the defendants entered their respective pleas of "not guilty," and on May 4, 1942, were placed on trial before a jury, found guilty and sentenced to imprisonment for a period of not less than one or more than fourteen years. Defendants bring the cause here contending that the evidence was insufficient to justify the conviction; that the indictment was invalid and that the State's Attorney committed prejudicial error in his argument to the jury wherein prejudicial remarks were made against the defendants with reference to their failure to testify, and that prejudicial remarks

were made concerning the character and appearance of the defendants.

The evidence reveals without dispute that on the night of September 3, 1940, William Allen, who was manager of the Well-Worth Five and Ten Cent Store, located on the north side of the square in Charleston, Coles County, Illinois, after having visited a picture show adjacent thereto, returned around 9:30 P. M. and entered the store; that he walked to the rear of the store and in so doing, was surprised by a beam from a flashlight in his face. No other artificial lights were burning in the store at that time. The party holding the flashlight said: "Stick 'em up. I got you covered." Allen, not realizing the seriousness of the situation and thinking some fellow employee was playing a prank on him, said, "That's what the rug said to the floor." Thereupon the person holding the flashlight, with a curse, struck Allen over the head with a blunt instrument, the nature of which is not disclosed, cutting a gash three or four inches in his head, but not rendering him unconscious. Allen asked his assailant for a doctor and was thrown some socks from the counter which he used in wiping the blood from his face. At this time a second confederate tied his feet and he was told to keep his head on the floor or he would be shot. A third confederate on the mezzanine floor called to one of the two on the main floor to open up the basement as they were ready to leave. The trio before leaving, cursed and insulted Allen and told him not to say anything until they got away or they would return and, if necessary, come to his home and get him.

After his assailants left, Allen went to the mezzanine floor, called the police and located his employer, George W. Benedict. The safe on the mezzanine floor was found to have been broken open and part of the contents scattered about the floor, the money having been taken, as well as other property. There were seventeen bags containing

money missing, some of which were later recovered from a wrecked automobile on State Route 130. Allen was unable to identify his assailants, but as they left the store he heard one say, "Pete, let's get ready to go."

The evidence offered by the People necessary to prove the defendants guilty beyond a reasonable doubt, was circumstantial. The defendants offered proof of an alibi. Twenty-one witnesses testified for the People, covering a wide range of circumstances offered for the purpose of connecting the defendants with the crime. In reviewing this evidence we find only one witness, Edward A. Huddleston, who attempts to identify the defendants as being at the scene of the wrecked car and his testimony is fraught with many contradictions. He testified he lived on Route 4, Charleston, Illinois, about one mile and a half south of town; that State Route 130 is a concrete road running south from Charleston, about one mile and a half or three-quarters, to a corner where it turns abruptly east; that Pink Sims lived on the northeast corner of the curve; that he lived between a quarter and a half-mile north and to the west of the curve; that between 9:20 and 9:30 P. M., having just arrived at his home, he heard and saw a car coming south on Route 130; that he stood on his porch about two minutes and heard a crash; that he drove immediately to the scene and parked on the left-hand side of the pavement headed northwest about six or eight feet from a car standing there; that his car had fifty-candlepower lights which were on bright; that the car standing there was using dim lights; that no one was in the car standing there. About this time three fellows came out of the bottom where the car was wrecked. They came to the guardrail along the road and to the car parked in front of him in the headlights of his car. One was following the other. The one in the middle was having trouble with his arm and he talked to one of them; that one was short and stocky, one

was approximately six feet tall and the other was a slender-built man; that he guessed the six-foot man to weigh 185 to 195; the chubby one at 165 or 170 and the third at 140; that he did not observe the color of the hair of any; that the smaller man asked him how to get to a hospital and that he helped the six-foot fellow and the one around 165 pounds to get in the car; that the 165 pounder got in first and the six-footer last, and the smaller one got under the wheel; that they were there five or ten minutes from the time he drove up until they left. While witness was testifying, he pointed out in the court room, Thomas Fagin, Norman Farr and Harley Grizzel, the defendants, and described them as the three men he saw at the wreck on September 3, 1940, and who drove off in a black Hudson car. Witness further testified he did not know their names at the time he observed them at the scene of the wreck.

His testimony was considerably weakened, due to the fact that in the first instance he identified the defendants through pictures sent to him and that he had never seen these men before and never saw any of them again until eight months later when he saw Fagin before the United States Commissioner in St. Louis, and never saw Farr and Grizzel until September 27, 1941, when they were in the circuit court of Coles county. His testimony was further weakened by his failure to remember as to how he had testified before the United States Commissioner and also by the fact that he was unable to describe a single article of clothing worn by any of the defendants or even to state whether they wore hats or coats at the time he observed the parties at the scene of the wreck.

There can be no question that the three persons observed by him at the scene of the wreck were the same parties who, a short time before, assaulted Allen and robbed the store. Their haste in getting away from their nefarious crime undoubtedly was the cause of their running off the

highway and wrecking their car. That they were the same persons is conclusively shown by the fact that the money and other numerous articles taken from the store, were found in the wrecked car. If the evidence had shown unquestionably that one of the defendants was the owner of the car and he had been further identified as the person at the scene of the wreck, it could hardly have been questioned he was not one of the parties who participated in the assault, but the evidence as to the ownership of the car and identification of the person is uncertain. It is insisted by the People that Robert Cramer was the owner of the automobile and that Robert Cramer was Norman Farr, but the proof shows that, while the car was sold to Robert Cramer, the automobile dealer making the sale never saw Cramer afterwards, and Cramer never paid the balance due on the conditional-sales contract. In testifying, the automobile dealer stated he had never seen Robert Cramer since the night of December 10, 1939, and made no attempt to identify Norman Farr as being the person to whom he made sale of the automobile.

Maurice Joseph, a witness for the People, testified he lived in New Athens, St. Clair county, Illinois; that he was a furniture and electrical dealer; that during the month of May, 1940, he was a policeman for the State of Illinois, examining for drivers' licenses in Belleville; that he continued as such until April 1, 1941; that he had seen People's exhibit 39 before; that it was a receipt for a driver's license; that the application was in the name of Robert Cramer and witness further stated that it was signed in his presence and that he gave Robert Cramer a test on that day; that he was driving a Mercury, bluish black; that he gave his address as a post-office box, Edgmont. At this point the witness, after having had an opportunity of seeing Robert Cramer and after having given Robert Cramer a driver's test, made this statement as to identi-

fication: "I see a man in this court room who has a resemblance to Robert Cramer (pointing to Norman Farr,) but I couldn't say for sure."

John M. Trendly, a witness for the People, testified that he was an examiner of disputed documents in writing; that he had testified in the State and United States courts and 40 cases in New York, New Jersey, Ohio, Illinois, Tennessee, Nebraska, Colorado, Kansas, Arkansas, Louisiana, and the Republic of Mexico; that he testified in the Patrick List case in New York, and the Bruno Hoffman case, and many others; that he devoted his entire time to his work, having studied books and pamphlets from men in the same business for 47 years. He examined the signature of Robert Cramer as shown on exhibits 18, 19, 39, and 41, and compared them with the name of Norman Farr as it appeared on exhibits 45, 46 and 51, and expressed an opinion they were written by one and the same person. He gave a lengthy statement as to the basis for his opinion, stating in part: "I base my opinion on the characteristics. There is what you call mind writing, the mind instead of furnishing the material gives all the attention to the hand and we find in most cases it is generally the first letter and the last letter that they make the changes in. There is also muscle writing, illustrated by pupils writing the same as a skillful writing teacher, which will appear to have been written by the same person. When they leave the school room, the writer loses the stiffness of form and gets the natural expression of his peculiarities of mental and physical characteristics."

Charles G. Rutson, a witness for the defendants, qualified also as an expert on disputed documents and writings and gave a lengthy statement as to a basis for his opinion. After examining People's exhibits 45, 46 and 51, and other exhibits as formerly testified to by witness Trendly, Rutson gave as his opinion that different persons wrote the names of Robert Cramer and Norman Farr; that the letter forma-

tion was totally different in the "Norman Farr writing" from that written in the "Robert Cramer writing," all of which indicates the questionable character of much of the testimony offered in this case.

Another witness for the People, postmaster Thomas M. Stein, testified that he rented a post-office box to a man by the name of Cramer but he failed to testify that Farr was the man Cramer who rented such box of him. A pair of glasses was found in the automobile and was traced to the optical company who sold the frames, and testimony was offered that the measurement of the lenses which were in the frames was the same as the measurement of the lenses that were in the frames that the company sold, but no satisfactory testimony was offered that they were ever sold to either of the defendants. Much of the testimony was conflicting and contradictory and, insofar as the guilt of the plaintiffs in error is concerned, is based upon circumstantial evidence.

In order to warrant a conviction of crime on circumstantial evidence, the proof of circumstances must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime. *People* v. *Burgard,* 377 Ill. 322; *People* v. *Rischo,* 262 id. 596; *Marzen* v. *People,* 173 id. 43; *Dunn* v. *People,* 158 id. 586.

It is true that direct evidence is not necessary, but to warrant a conviction on circumstantial evidence the facts proved must so thoroughly establish the guilt of the person accused as to exclude every reasonable hypothesis of his innocence. (*People* v. *Burgard, supra; People* v. *Gregor,* 359 Ill. 402; *People* v. *Christocakos,* 357 id. 599; *People* v. *Ahrling,* 279 id. 70.) The burden rests upon the People to prove beyond a reasonable doubt not only the commission of the crime charged, but also the commission of the crime by the accused and by no one else. *People*

v. *Burgard, supra; People* v. *Hooper,* 364 Ill. 320; *People* v. *Christocakos, supra.*

Analyzing the evidence in this case, we find a serious question presents itself as to whether or not proper proof of identification has been made sufficient to identify the defendants beyond a reasonable doubt, and this, taken in connection with the proof of an alibi, leaves the record in a state for further consideration. We find the law to be that where witnesses may be mistaken in identifying the accused and an alibi is proved by other witnesses who give their residence and occupation, so that the truth or falsity of their testimony may be inquired into on another trial, the court will take this into consideration and will give the accused the benefit of a second trial. *People* v. *Rischo, supra; Lincoln* v. *People,* 20 Ill. 365.

The fact that the evidence of the guilt of the plaintiffs in error is by no means of a conclusive character, requires us to consider the record to determine whether or not it is free from prejudicial error. Plaintiffs in error, before entering their pleas of not guilty and before trial, filed their verified motion to quash the indictment, alleging, among other things, that the grand jury was not selected in accordance with the Juror's Act (Ill. Rev. Stat. 1941, chap. 78, sec. 9,) and that the prosecution and the court committed error in calling a special rather than a regular grand jury. No regular grand jury was summoned for the regular January, 1942, term of the Coles county circuit court. However, on January 12, 1942, which was the first day of the January, 1942, term of said court, a verified petition was filed by the State's Attorney requesting the calling of a special grand jury alleging among other things that there were a number of prisoners in jail without bond, that there would be no other term within four months at which a regular grand jury would be called, and that public justice demands and requires that a special venire be issued for a grand jury. Following this the court ordered a spe-

cial venire for a special grand jury, reciting: "It appearing that public justice requires that a special venire be issued for a grand jury, and the court being of the opinion that public justice requires that a special venire be issued for a grand jury." An order was then issued for such special venire to appear January 26, 1942, and was signed by the presiding judge.

Plaintiffs in error rely upon the provision found in Illinois Revised Statutes 1941, chapter 37, paragraph 72.9, which paragraph, in part, reads as follows: "In the county of Coles on the third Monday of April and the second Mondays of October and January: Provided, that no grand jury shall be summoned for the January term of Coles county, unless ordered by the court." Counsel for the defendants contend that the statute provides that a regular grand jury should be summoned on order of the court for the January term, that this section should have been followed, and that such grand jury should have been selected in accordance with section 9 of the Juror's Act, (Ill. Rev. Stat. 1941, chap. 78, par. 9,) which provides, in part: "If a grand jury is required by law or by the order of the judge for any court, the County Board in each of the counties in this State wherein such court is directed to be held, at least twenty (20) days before the time of appearance specified in the summons hereinafter mentioned, shall select twenty-three (23) persons * * *." While this is proper when a grand jury is required by law or by order of the judge, it is not the only way that is provided by statute for the proper calling of a grand jury. It is provided in the Juror's Act (Ill. Rev. Stat. 1941, chap. 78, sec. 19,) as follows: "The judge of any court of record of competent jurisdiction may order a special venire to be issued for a grand jury at any time when he shall be of opinion that public justice requires it."

No restraint has been imposed by the constitution upon the power of the legislature to determine at what time,

under what circumstances and in what manner, a grand jury may be summoned, but the matter has been left entirely to the discretion of the legislature. (*People ex rel. Ferrill* v. *Graydon,* 333 Ill. 429.) The legislature, exercising its powers, has made provisions for impaneling a special grand jury. The act authorizes the issue of a special venire for a grand jury at any time the judge shall be of opinion that public justice requires it. A verified petition was filed and the court ordered a special venire to be issued for a grand jury. This was done and there was no error in so doing.

It is urged by defendants in error that the State's Attorney, when he was arguing to the jury, referred to the fact that the accused had not taken the witness stand as witnesses in their own behalf. The court sustained objection to these remarks and the jury was instructed to disregard them, and, although an objection had been made and sustained and the jury instructed to disregard the statement, the State's Attorney followed with these words: "Who knows better what happened than the defendants?" He also referred to the defendants as crooks, thugs and gangsters and followed that by referring to one of the defendants in this language: "Look at those eyes. Aren't they the slant eyes of a Jap?" Such argument was highly inflammatory and improper, and, although there is some controversy as to just exactly what words were used, the record before us was certified by the official court reporter that the transcript of a portion of the argument on behalf of the People by the State's Attorney was true and correct. The use of such prejudicial argument was in violation of the defendants' statutory and constitutional rights, and the fact that some of the remarks were repeated after an objection had been sustained by the court would indicate a disregard for the ruling of the court and the preservation of the constitutional rights of the accused, and constituted prejudicial error. This court has many times condemned

the use of such argument and it is unnecessary to cite authorities.

Each of the defendants offered proof of a separate alibi and separate instructions were offered by each defendant, but they were all refused by the court. The court did, however, give an instruction purporting to state the general rules as to proof of an alibi and made it applicable generally to all of the defendants, and while it is admitted this was a proper general instruction, it would seem the better way to give separate instructions where proof has been offered wholly separate and distinct. The defense of an alibi is not only legitimate, but may be a very complete defense. In fact it may be the only means which an innocent man may have of avoiding a conviction, and instructions thereon should not be restricted to one general instruction where each of several defendants has made proof of a separate alibi. It is improper to deprive a defendant of the right to have the jury fully instructed as to his individual rights and upon the basis of the evidence applicable to his own defense.

Instruction number 13 was given to the jury at the request of the People and reads as follows: "The Court instructs the jury that, before the defendants, Harley Grizzel; Thos. Fagin, alias Tommy Fagin, alias Herman Berlin, alias Herman Berlinda; and Norman Louis Farr, alias Louis Fawr, alias Frank Johnson, alias Frank Wittenbrink, alias Robert Cramer, can avail themselves of the defense of an alibi, the proof must cover the whole of the time of the commission of the crime so as to render impossible, or highly improbable, that the defendants, Harley Grizzel; Thos. Fagin, alias Tommy Fagan, alias Herman Berlin, alias Herman Berlinda; and Norman Louis Farr, alias Louis Fawr, alias Frank Johnson, alias Frank Wittenbrink, alias Robert Cramer, could have committed the acts; and, unless the proof in the case *comvers* the whole° time so as to render the commission of the crime by the defendants,

Harley Grizzel; Thos. Fagin, alias Tommy Fagan, alias Herman Berlin, alias Herman Berlinda; and Norman Louis Farr, alias Louis Fawr, alias Frank Johnson, alias Frank Wittenbrink, alias Robert Cramer, impossible or highly improbable, that defense is not available to such defendants."

Plaintiffs in error object to the giving of this instruction. There was no error in giving this instruction to the jury even though the testimony of the witnesses for the defense did cover the whole of the time of the commission of the offense. This same instruction has been approved by this court in *People* v. *Falley,* 366 Ill. 545, *People* v. *Gasior,* 359 id. 517, and *People* v. *Herbert,* 361 id. 64.

The court also gave to the jury at the request of the People, instructions 1, 2, 7, 9, 10 and 11. In these instructions each of the defendants was described with a number of aliases and from the record it appears there was no substantial evidence offered of any aliases. Objection was made to this before the instructions were given and while the court did eliminate such aliases from the form of the verdict, they were not eliminated from other instructions. When instructions are given using the name of the accused, followed by *alias* and another name, *alias* stands for *"alias dictus"* and indicates, not that the person referred to bears both names, but that he is called by one or the other, and hence, the use of either one of said names identifies the accused as the person referred to. The true name is that which precedes an *alias dictus.* An *alias dictus* is only reputation and is not the truth. It is generally understood that a man's reputation is not enhanced by connecting many aliases with his name and certainly if the record does not offer substantial evidence of any aliases it is improper to refer to the defendants as such in the instructions given by the court. People's instructions number 1, 2, 7, 9, 10 and 11 should not have been given describing each of the defendants with a number of aliases. The

aliases should have been eliminated before giving the instructions to the jury.

It is contended by the defendants that the jury was not properly handled during its deliberations and the attorneys, in support of the motion for a new trial, filed affidavits setting forth that, after the jury had entered the jury room for deliberations and after being there a short time, the sheriff was seen to enter the jury room alone and, after a short period, to come out; that on another occasion while the said jury was deliberating, the sheriff or one of his deputies opened the jury-room door and one of the men jurors came out and walked down the hall with the sheriff and was gone about five minutes; that the bailiff in charge of the jurors did not accompany them; that the jury was in the custody of sworn man and woman bailiffs, not the sheriff and his deputy; that the sheriff was seen entering the jury room and, while the jury was deliberating, coca cola and candy were brought by him or some other unauthorized person and furnished to the jury; and that the sheriff accompanied the jury to the public restaurant when they took their meals and was observed talking to the various jurors. Counteraffidavits were filed denying or explaining such conduct, but, in any event, the record shows sufficient facts to indicate that the handling of the jury was not in accordance with the care required by statute. It does not appear, however, from the facts stated, that prejudice resulted. In order to constitute grounds for setting aside the verdict of a jury on account of their conduct it is necessary to show the defendant was prejudiced. *People* v. *Coniglio,* 353 Ill. 643; *People* v. *Fisher,* 340 id. 216; *People* v. *Brothers,* 347 id. 530.

This entire case was built on circumstantial evidence, and to warrant a conviction on circumstantial evidence the facts proved must so thoroughly establish the guilt of the person accused as to exclude every reasonable hypothesis

26

of his innocence. In any case where the competent evidence leaves a close question for the jury to decide as to the guilt or innocence of the defendant, it is necessary that the jury be properly instructed and the rights of the defendant be not prejudiced by improper remarks. Other errors are urged but need not be considered. They are not likely to arise upon another trial.

For the reasons stated, the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*