THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CORNELL BOYD *et al.*, Defendants-Appellants.

First District (5th Division)   No. 77-1252

Opinion filed November 9, 1978.

Ralph Ruebner and Gordon Berry, both of State Appellate Defender's Office, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Rimas F. Cernius, and James M. Thunder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendants were convicted of armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2) and sentenced to terms of 4 to 12 years. On appeal, they contend that the trial court erred in: (1) refusing to accept a negotiated plea of guilty to a reduced charge of simple robbery; (2) permitting the State to introduce the prior consistent statement of an occurrence witness that he accurately described defendants after the robbery, and (3) permitting the State to introduce computer printouts into evidence.

At trial the following pertinent evidence was adduced.

*For the State*
*Miguel Gomez*

At approximately 7:15 or 7:20 p.m. on December 22, 1973, he was at the Chicago Transit Authority (CTA) station at 69th Street. The "el" platform where he waited was well lit and he observed two other persons "far ahead of me." He testified that "[t]hose two people robbed me" and identified them in court as defendants Raymond Williams and Cornell Boyd. At the time of the robbery Boyd was wearing a blue jacket and Williams was wearing an army jacket. Defendants hit him above the right eye, on the back of the head and in the chest. Boyd was carrying a knife and "was trying to hit me with the knife while the other was hitting me on the head." Williams then held Gomez's hand while Boyd removed his watch. After defendants ran away, he remained there for approximately 15 minutes until the police arrived and took him to the squad car just outside the 69th Street CTA station. When he approached the police car he observed the two men who had robbed him seated in the back seat.

On cross-examination he testified that he first observed defendants as they came down the stairs to the "el" platform, approximately 15 feet from where he was standing. He admitted that he did not see defendants' faces at first. They continued to walk about 15 feet past him, then "sort of did a half turn," and started to attack him. Although he did not attempt to fight defendants, he did hold his hands out so that they would not "pierce me with the knife" and was able to observe their faces. When he subsequently observed defendants in the police car he said, "those people there, are the ones who hit me" and told the officers "they took my watch."

*Claude Fields*

He is employed by United States Steel as an electric crane operator. At 7:15 or 7:20 p.m. on December 22, 1973, he was at the "el" station at 69th Street. He was about to go down the stairs to the platform when

he observed "two male Negroes, one with a knife, with a male Mexican between the two of them." He later learned that this Mexican was Miguel Gomez. He identified defendants as the "two male Negroes." He was about 25 feet away from the three men and the lighting was "very bright." Boyd held a knife while Williams struck Gomez on the back of the head. Williams then grabbed Gomez by the arm and Boyd "wrestled his watch from him." Defendants then ran past him, up the stairs from the platform to the street level, and southwest on Vincennes Avenue. He was able to observe defendants' faces for about half a minute. After defendants fled, he ran to the street, stopped a police car, and told the two officers in the car that he had just seen a male Mexican get robbed by two male Negroes who fled southwest on Vincennes Avenue. He then got into the back seat of the squad car which proceeded southwest on Vincennes, the direction in which he had seen defendants run. A few minutes later he observed defendants on 70th Street, between Vincennes and Wentworth, walking west, and said "those are the two men." As the police officers approached defendants and informed them they were under arrest, he saw someone "pitch" a knife toward the street. After defendants were taken into custody he returned with the police in the squad car to the CTA station. Defendants were seated in the back seat of the squad car. When they arrived at the CTA station, Gomez approached the police car and "pointed in the back of the car twice" and toward his left wrist.

On cross-examination he admitted that during the course of the robbery he had only observed the face of each defendant for approximately 15 seconds. At no time did he have a conversation with Gomez.

*Robert Konrath, a Chicago Police Officer*

On December 22, 1973, at approximately 7:25 p.m. he and his partner, William Kidd, were on patrol in a marked police car near 69th and State Streets when a man identified as "Clyde" Fields "flagged us down." After a conversation with Fields, the officers placed him in the squad car and commenced touring the area. Approximately a block and a half or two blocks from the CTA station at 69th Street they observed two male Negroes identified as defendants, walking west on 70th Street. Defendant Boyd was wearing a long blue overcoat while Williams was wearing an army field jacket. When he stopped the car near defendants, he observed Williams throwing a knife, which he later recovered, into the snow. The officers then handcuffed defendants and placed them in the back seat of the squad car. Approximately two or three minutes had elapsed since Fields had originally hailed the officers. After returning to the CTA station, he "went down to the platform to look for a victim of a robbery," and found Gomez, who had a cut over his eye and several bruises on his face. He then accompanied Gomez to the street where Gomez "started pointing to the back of the squad car" in which the

defendants were seated. The officers then took defendants to the police station.

On cross-examination he stated that when he brought Gomez to the squad car he "asked [Gomez] if these were the men that had robbed him" and Gomez replied, "Si."

*William Kidd, a Chicago Police Officer and Officer Konrath's partner*

He substantially corroborated Konrath's testimony. After transporting defendants to the police station, he searched the back seat of the squad car and found a carving knife and a watch. He had previously searched the back seat at 3 p.m. that day prior to the arrest, without finding anything.

On cross-examination he admitted that he had searched Williams prior to placing him in the squad car, but did not find a knife or a watch.

At the close of the State's case in chief the parties stipulated that Raymond Williams was 26 years old and Cornell Boyd was 24 years old.

*For the Defendants*

*Samuel Leon Dickerson*

On December 22, 1973, he saw defendants at the Crib Lounge, 7041 South Wentworth Avenue. Williams arrived at the lounge at approximately 5:30 p.m. while Boyd arrived at about 6 p.m. Defendants left the lounge together at 7:25 p.m. He did not observe either defendant carrying a knife or any other weapon. Boyd was wearing a navy blue, floor length coat while Williams was wearing a field jacket.

On cross-examination he admitted that he first learned he might be called to testify on defendants' behalf approximately a year after their arrest. He is certain defendants left the lounge at 7:25 p.m. because he looked at the clock as they departed. He admitted that defendants were both his friends.

*Cornell Boyd, on his own behalf*

On December 22, 1973, he was employed by the American Feather Products Corporation, but "was laid off because of a slack of work for the holidays." On that date he was at the Good Rocking Lounge until about 6:15 p.m. when he went to the Crib Lounge where he saw Raymond Williams and Samuel Dickerson. He left the Crib Lounge at "about 7:25, 7:28" with Williams. They left in order "to get some wine or whiskey" at another local establishment. However, when they reached the intersection of 70th Street and Wentworth they were arrested by the police. He was not carrying a knife and did not see anyone throw a knife. He also denied robbing Gomez or even being at the CTA station at 69th and State Streets prior to his arrest. Nor did he place a knife or watch in the police car in which he was placed after his arrest.

On cross-examination he testified that he had been laid off from American Feather Products about a week prior to his arrest on December

22, 1973. While at the Crib Lounge he talked to a "lady friend" until about 7:20 p.m. when he told her that he and Williams were going to walk down the street to the Good Rocking Lounge at 6954 Wentworth to get some wine or whiskey. He admitted that at the time he was wearing "a long cashmere navy blue coat" and Williams was wearing a green field jacket.

*Raymond Williams on his own behalf*

On December 22, 1973, at about 5:30 p.m. he was at the Crib Lounge where he saw Cornell Boyd, Sam Dickerson and several other friends. He left the lounge at 7:25 p.m. with Cornell Boyd. As they walked north on the east side of Wentworth they were stopped and searched by police officers. He did not throw away a knife. The police officers put defendants in the back seat of the squad car and drove to the CTA station. At 69th and State Streets where Miguel Gomez, whom he had never seen before, "pointed his finger at the car, at us." He denied having been on the CTA platform at 69th and State Streets at or about 7:20 p.m. on December 22, 1973, or having struck and robbed Gomez, nor did he see Boyd rob Gomez.

On cross-examination he admitted that on December 22, 1973, he was wearing an army field jacket and that Boyd was wearing a long, dark blue cashmere coat. He did not see either of the officers pick up a knife from the snow at the time of his arrest.

*For the State—Rebuttal*
*Catherine Conwell*

She is employed as bookkeeper for American Feather Products and has charge of company payroll records. She identified People's Exhibit No. 4 as Boyd's employee time cards and stated that the last time card for Boyd was dated August 3, 1973. She was not able to locate any cards for Boyd dated after August 3, 1973. She identified People's Exhibits No. 5, 6, 7 and 8 as accurate xerox copies of computer printouts prepared by the data processing section of Exchange National Bank for her company. People's Exhibit No. 5 was a payroll register showing that Boyd had been assigned employee number 62. People's Exhibit No. 6, a payroll register dated August 10, 1973, reflected a change in Boyd's employment status from "active" to "terminate." People's Exhibit No. 7 was a payroll register dated September 21, 1973, which indicated that Boyd received a check for a cost of living adjustment to his earnings for the first quarter of 1973. She also identified People's Exhibit No. 8, a payroll register dated December 28, 1973, as being related to payments to Boyd for the second quarter of 1973. The payroll records did not indicate any payments to Boyd from American Feather Products for work done after August 3, 1973. After receiving computer printouts from Exchange National Bank she would compare them to the original information which she had provided to the bank for processing. She testified that although she once

saw Boyd "talking to the girl at the front desk" at American Feather Products, she never saw him working at the company.

On cross-examination she admitted that she did not begin employment at American Feather Products until either October 30 or October 31, 1973. She also admitted that she did not know whether any employment checks had been made out to Boyd after August 1973, but that such information could be provided by the Exchange National Bank. She did not operate the computer which provided the printouts nor was she present when the information was "fed into the computer." She further admitted that from People's Exhibits Nos. 4, 5, 6, 7 and 8 it was not possible to determine whether Boyd was employed by American Feather Products from December 1, 1973, until December 21, 1973. She finally admitted that after she started working at American Feather Products she had seen Boyd there "one, maybe two or three" times.

*For the Defendant on Surrebuttal*
  *Cornell Boyd on his own behalf*

He was laid off from American Feather Products in August 1973 "because of lack of work" but went back to work there before Thanksgiving. He worked until about December 14, 1973, when he was again laid off.

On cross-examination he testified that his check stubs for his payments from American Feather Products were "in my wallet when I was arrested" and were not returned to him.

OPINION

Defendants first contend that the trial court erred in refusing to consider a negotiated plea of guilty to the reduced charge of robbery. They argue that the trial court erroneously ruled that neither the court nor the State has the power to reduce a charge of armed robbery to robbery where there is evidence that a weapon was used in the commission of the offense.

Supreme Court Rule 402(d)(2) (Ill. Rev. Stat. 1975, ch. 110A, par. 402(d)(2)) provides in pertinent part that:

> "If a tentative plea agreement has been reached by the parties which contemplates entry of a plea of guilty in the expectation that a specified sentence will be imposed * * *, the trial judge may permit, upon request of the parties, the disclosure to him of the tentative agreement and the reasons therefor in advance of the tender of the plea. * * * The judge may then indicate to the parties whether he will concur in the proposed disposition * * *."

Although defendants claim that a tentative plea agreement between them and the State was submitted to the trial court for approval, the record before us does not so indicate. Following the trial court's denial of

defendants' motion to suppress certain evidence, defense counsel "request[ed] a conference with the idea of disposing of this matter." After a recess for the requested conference, the trial court stated its version of the conference as follows:

> "The defendants' attorney said that he would like to have the charge reduced from armed robbery to plain robbery, and this Court said that it could not, based upon the kind of evidence stated by the State that it would show from the complaining witnesses, the weapon being used, and that weapon being recovered, that it couldn't be reduced to plain robbery, and I would not, therefore."

Defense counsel disagreed with this summary, claiming that the State had agreed to a reduction of the charges at the conference. The Assistant State's Attorney, however, replied that such an "offer was made to the defendants prior to any indication that the defense would proceed on a motion [to suppress]." The trial court then stated that it would like to hear "a reason why [the charges] should be reduced * * *." The State rather than offering any response to the trial court's query, answered ready for trial. After further discussion on what had occurred at the conference the following exchange occurred:

> "ASSISTANT STATE'S ATTORNEY: I want to make one point clear. We are not at this time requesting a reduction from armed robbery to robbery.
>
> THE COURT: Fine.
>
> DEFENDANTS' COUNSEL: Will you please let the record show that they previously requested it.
>
> ASSISTANT STATE'S ATTORNEY: No. That is erroneous. Only pursuant to a plea of guilty. We have a jury out there. I would like to call the jury in and at least get initial statements made * * *."

We have carefully reviewed the record here and find no indication that the State joined defendants in presenting a plea agreement to the trial court for its concurrence. The State expressly rejected any such agreement in open court and defendants' contention is therefore without merit.

■■ Furthermore, even had a plea agreement been offered to the trial court we note that Supreme Court Rule 402(d)(2) (Ill. Rev. Stat. 1975, ch. 110A, par. 402(d)(2)) does not require that the trial court accept the negotiated plea. It is clear that there is no absolute right to have a plea of guilty accepted by the trial court and such a plea may be rejected in the exercise of sound judicial discretion. *Santobello v. New York* (1971), 404 U.S. 257, 30 L. Ed. 2d 427, 92 S. Ct. 495; *People v. Morgan* (1973), 14 Ill. App. 3d 232, 302 N.E.2d 152.

■■ Defendant next contends that the trial court committed error when it permitted the State to introduce testimony by witness Claude Fields

that he told the police he had seen the robbery and that he described the offenders to the police. They argue that the testimony was inadmissible both as hearsay and as a "prior consistent statement." Defendants filed a written motion for a new trial specifying the grounds relied upon. The motion for a new trial did not raise the issue of Fields' prior statement to the police officers. "[T]he failure by the defendant to raise an issue in the written motion for a new trial constitutes a waiver of that issue and it cannot be urged as a ground for reversal on review." (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856, 857.) Although defendants concede that the motion was not specific as to the alleged error, they urge that the waiver rule be relaxed here. It is true that this court may consider alleged errors which have not been properly preserved for review where the evidence is closely balanced (*People v. Bradley* (1964), 30 Ill. 2d 597, 198 N.E.2d 809) or where the issue was brought to the attention of and ruled upon by the trial court and where the defendant would be prejudiced should his contention prove correct. (*People v. Dees* (1977), 46 Ill. App. 3d 1010, 361 N.E.2d 1126.) In the present case we do not believe the evidence was closely balanced, nor do we believe defendants suffered prejudice sufficient to warrant a reversal even were their contention proved correct. Accordingly, we find no reason for departing from the general rule that issues not properly preserved for review are waived.

Defendants finally contend that it was error for the trial court to admit into evidence certain computer printouts, People's Exhibits 5-8, to rebut Boyd's testimony that he was employed at American Feather Products until December 1973. Although it is true that computer records may be admissible under Supreme Court Rule 236 (Ill. Rev. Stat. 1975, ch. 110A, par. 236), a proper foundation must first be laid. (See *Grand Liquor Co. v. Department of Revenue* (1977), 67 Ill. 2d 195, 367 N.E.2d 1238.) In *Department of Mental Health v. Beil* (1976), 44 Ill. App. 3d 402, 409, 357 N.E.2d 875, 880, the court stated that before computer records may be admitted into evidence:

> "[I]t must be shown that the electronic computing equipment is recognized as standard, that the entries are made in the regular course or business at or reasonably near the time of the happening of the event recorded, and that the testimony satisfies the court that the sources of information, method and time of preparation were such as to indicate its trustworthiness and justify its admission."

In the present case the State failed to demonstrate that the computer from which the printouts were obtained was properly operated, standard equipment. Moreover, witness Conwell, the bookkeeper for American Feather Products through whom the computer printouts were introduced into evidence, did not testify that she had verified the accuracy of the

printouts. Accordingly, we agree that under the facts here a proper foundation was not established to justify the admission of the computer printouts into evidence.

■■ However, we will not reverse a judgment of conviction merely because an error has been committed, unless it appears that justice has been denied or that the jury verdict may have resulted from such error. (*People v. Tranowski* (1960), 20 Ill. 2d 11, 169 N.E.2d 347, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290.) Upon a careful review of the record here we are convinced that the evidence of defendants' guilt was overwhelming. Both the victim of the armed robbery and witness Fields identified defendants shortly after the occurrence and in court as the offenders. We, therefore, hold that the error complained of here was harmless beyond a reasonable doubt.

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

MEJDA and WILSON, JJ., concur.