THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SHIRLEY MAXINE FERNETTI, Defendant-Appellant.

Third District   No. 82—548

Opinion filed August 5, 1983.—Rehearing denied September 12, 1983.

F. Stewart Merdian, of Lewistown, for appellant.

Thomas J. Homer, State's Attorney, of Lewistown (John X. Breslin and Kenneth A. Wilhelm, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE TRAPP delivered the opinion of the court:

Defendant Shirley Fernetti was convicted at a bench trial of the offenses of involuntary manslaughter (Ill. Rev. Stat. 1981, ch. 38, par. 9—3) and armed violence (Ill. Rev. Stat. 1981, ch. 38, par. 33A—3(a)), and sentenced to the minimum term of six years on armed violence. On appeal she claims that: (1)The evidence of guilt of armed violence predicated on involuntary manslaughter was insufficient to prove her guilty beyond a reasonable doubt; (2) the trial court improperly denied her plea of guilty to the charge of involuntary manslaughter; (3) the trial court abused its discretion in failing to declare a mistrial as a sanction for the prosecutor's violation of a discovery order; and (4) the prosecutor denied her a fair trial by interjecting racial prejudice into the case. We affirm.

On December 28, 1981, defendant shot and killed her neighbor and friend Marguerite "Sue" Fernetti from a distance of 105 feet with a gun which defendant testified she believed to be an unloaded pellet gun, but which turned out to be a loaded .22-caliber rifle. The events leading up to this tragic result are not in serious dispute between the parties. An issue raised by the defendant is whether her acts were reckless beyond a reasonable doubt and support a conviction of involuntary manslaughter.

In 1973, defendant married Dixie Fernetti and moved into his home in Hooty, Illinois, a small unincorporated town in Fulton County. Shortly after defendant's marriage, decedent married Carl Fernetti and moved into the house adjacent to Dixie. Carl Fernetti had been raised by Dixie's brother and sister-in-law, and had adopted the Fernetti name when he was 18.

Relations between the Fernettis were cordial in the early years that Sue and Carl and defendant and Dixie lived there, but in 1979 discord developed over a boundary dispute between Carl Fernetti and Otto and Irma Wells, other Hooty residents. Apparently, Shirley and Dixie were partial to the Wells' claim and were concerned that Carl would harass the Wells. Following the boundary dispute, Dixie or-

dered defendant to call the County Health Department and report Carl for burning garbage on his property. After this incident the husbands stopped speaking to each other, and Shirley was told by Dixie that Sue could not come over to their house. The friendship between Shirley and Sue continued, but only while Dixie and Carl were away at work. Testimony of several witnesses indicated that Shirley and Sue had at one time been good friends, especially after Sue had children, but that once the men began "feuding" the friendship became strained. For two years neither Carl nor Dixie spoke to each other.

On December 28, 1981, Dixie was unable to work due to inclement weather and instead he and defendant drove to Canton, Illinois, to purchase chrome treatment for antiques he was restoring. Before leaving Hooty, Dixie noticed Carl Fernetti's children and their dog in his yard and told them that they should keep the dog out of the yard, or he was going to call the dogcatcher. Upon their return, Dixie decided to work on antiques which were stored in a trailer adjacent to their home, and Shirley went inside to watch television with her 79-year-old mother who lived with them. In the meantime, Carl had returned home and was told that Dixie reprimanded the children for allowing the dog to run loose. When Dixie exited the trailer, Carl went outside and yelled to Dixie that if he had anything to say to his kids, he should say it to him. Dixie replied that he had not hollered at the children, and Carl retorted with curse words. The argument soon escalated and within minutes both men were on the ground fighting.

Defendant, who had been inside with her mother watching television and playing cards, looked out the kitchen window which faced the adjacent lot and saw Carl and Dixie on the ground. She told her mother that there was going to be a fight and the mother stated that she didn't want to have anything to do with it, and walked into the living room. Shirley testified that she wasn't going to watch the fight, but something kept pulling her back to the window. Moments later, Sue came out to see what was going on, and two other men who had heard the commotion walked over to the scene.

Defendant had been pacing back and forth in the house and was very upset. She testified that she saw Sue come out of the house and kick Dixie and that she thought the other men were going to help Carl. She screamed to her mother "they're going to kill Dixie," put on her coat, walked to the back porch where Dixie kept some guns, picked up a rifle and ran outside. She testified that when she went outside, Sue and the two men were standing fairly close to where Carl and Dixie were struggling. She yelled to Sue, "let it be a fair fight," and Sue replied, "well if it isn't big mother" and motioned for

her to come over. Defendant yelled back, "Sue, I have a gun here," and she replied, "well go ahead and shoot me." Defendant pulled the rifle to her shoulder and shot Sue from a distance of 105 feet. The .22-caliber bullet hit Sue in the forehead causing her death. Defendant testified that when Sue fell she thought that she was just goofing off, but once she realized what had happened she was hysterical. She dropped the gun, ran to where Sue was lying, and then ran back into her house to call for help. On December 29, defendant was charged with murder, involuntary manslaughter, and armed violence.

The only matters which were the subject of conflicting testimony were whether the decedent merely pushed Dixie off of Carl, or kicked him twice, and, most importantly, the extent of defendant's knowledge of the gun. After the shooting, defendant gave lengthy statements to sheriff's deputies and the State's Attorney of Fulton County, including statements that she knew the gun she thought she picked up had been used by Dixie to shoot birds; she thought the projectile would go over the decedent's head; she knew nothing of guns; and, she had picked up the gun to prevent Sue and the other men from intervening in the fight between Carl and Dixie.

At trial, defendant testified that she thought the gun she had picked up was an unloaded pellet gun which had been used by her husband to shoot birds. This testimony was corroborated by Dixie and defendant's mother, both of whom testified that Dixie kept a pellet gun and a rifle on the back porch and that normally Dixie placed the pellet gun immediately to the right to the door. Dixie stated that on Christmas day he replaced the pellet gun with a .22-caliber rifle which he had also been using to shoot birds. Defendant likewise indicated that she thought Dixie normally kept the pellet gun to the immediate right of the door. A photograph of Dixie's pellet gun and the .22-caliber rifle shows a remarkable similarity in appearance.

Other evidence supported the theory that the bullet had ricocheted off a tree standing several feet to the south of the bullet trajectory which the State's witnesses had reconstructed. This theory was predicated entirely on the testimony of Dr. Robert Herbert, who had examined the site six months after the shooting. Other testimony tended to establish that the defendant was acting in defense of her husband. Defendant also presented testimony to support a defense of insanity, although she does not argue on appeal that the State failed to meet its burden of proving her sane beyond a reasonable doubt. Insofar as this evidence is relevant to our inquiry, it tended to show that defendant has severe nerve problems and is unable to perform ordinary tasks without shaking. Defendant's treating psychiatrist related

that defendant had a history of nervous tremors, and described her condition as an anxiety disorder with panic attacks.

■ To sustain the defendant's conviction for armed violence based on the felony of involuntary manslaughter, the State was required to prove beyond a reasonable doubt that while armed with a dangerous weapon defendant recklessly performed acts likely to cause death or great bodily harm and which, in fact, caused the death of another without lawful justification. (Ill. Rev. Stat. 1981, ch. 38, pars. 9—3, 33A—2.) An act is performed recklessly when a person consciously disregards a substantial and unjustifiable risk that circumstances exist, or that a result will follow, and such disregard constitutes a gross deviation from the degree of care which a reasonable person would exercise. Ill. Rev. Stat. 1981, ch. 38, par. 4—6.

■ The pointing of a gun, whether loaded or believed to be unloaded, as well as the reckless handling of a loaded gun, has been held sufficient evidence of a conscious disregard of a substantial and unjustifiable risk that death or great bodily injury would follow. (*People v. Moczarney* (1978), 65 Ill. App. 3d 410, 382 N.E.2d 544; *People v. Bembroy* (1972), 4 Ill. App. 3d 522, 281 N.E.2d 389; *People v. Rodgers* (1971), 2 Ill. App. 3d 507, 276 N.E.2d 504; *People v. Schwartz* (1978), 64 Ill. App. 3d 989, 382 N.E.2d 59.) An accidental discharge of a gun, however, has been held insufficient proof to sustain a conviction of involuntary manslaughter. (*People v. Spani* (1977), 46 Ill. App. 3d 777, 361 N.E.2d 377.) The inquiry here is between an accidental and a reckless shooting. The element distinguishing the two and resulting in the imposition of criminal liability is the fact finder's conclusion that the defendant's conduct was not merely negligent but was reckless by reason of a gross deviation from the standard of care a reasonable person would exercise. Where an accused has fired a fatal shot while aiming at, or in the direction of the decedent, it is the province of the fact finder to decide if the killing amounted to reckless conduct or misadventure (*People v. Kelly* (1975), 24 Ill. App. 3d 1018, 322 N.E.2d 527), and its determination will not be lightly disregarded unless the verdict is palpably contrary to the weight of the evidence. *People v. Post* (1968), 39 Ill. 2d 101, 233 N.E.2d 565.

■ On the day following the shooting, defendant made statements later introduced at trial which indicated that she thought the gun was loaded and even had it been a pellet gun it would have done the same damage. Defendant stated on one occasion:

"[STATE'S ATTORNEY]: Well, when you pulled the trigger of the gun, what did you think would happen?

DEFENDANT: I just, at the time when I did it, I just fig-

ured it would go up over her head, you know, up in the air.

STATE'S ATTORNEY: What did you think would go up in the air? The bullet?

DEFENDANT: The bullet."

These statements were later retracted by defendant's testimony but, if believed, such responses would clearly demonstrate her conscious disregard of a substantial and unjustifiable risk that her actions would cause the death of Sue Fernetti. On cross-examination, defendant admitted she did not mention the fact she thought the gun was a pellet rifle when questioned by the sheriff's office on the night of the shooting, and she also stated that she was aware the pellet rifle had been used by her husband to kill birds at a distance of 70 feet. Even if defendant thought she was aiming an unloaded pellet gun at decedent, her conduct would still be sufficient to support a conviction for involuntary manslaughter. As noted in *People v. Schwartz* (1978), 64 Ill. App. 3d 989, 994, 382 N.E.2d 59, 64, "the trier of fact could have properly determined that defendant acted recklessly in not checking the condition of the gun prior to the incident ***."

In the light of the numerous statements by defendant showing her awareness of the general propensities of rifles, we cannot say that the trier of fact's conclusion is unreasonable or palpably contrary to the evidence. Nor can we say that the verdict is palpably contrary to other evidence suggesting that defendant acted in defense of Dixie, and that the bullet ricocheted off a tree several feet to the south of the trajectory of the bullet reconstructed by the State.

Defendant admitted at trial that she was not intimidated by the decedent when she fired, and that Sue was not attacking or threatening Dixie. Neither Sue nor any person at the scene of the shooting had a weapon, and no one other than Carl was fighting Dixie. Defendant was not trying to prevent Carl from harming Dixie and, in fact, wanted the men to fight to release their suppressed animosities. The ricochet theory is at variance with testimony of one of the bystanders who stated that he saw defendant raise the gun to her shoulder in decedent's direction and defendant's own statement that she thought the bullet would go up over decedent's head. Defendant was also asked if she pointed the gun at Sue to which she replied "I just—I must have, otherwise I wouldn't have shot her if I hadn't."

At the pretrial conference in this case, the defendant tendered to the court a plea of guilty to count III of the information which charged her with involuntary manslaughter. The trial court denied the offer then, and a further tender of a plea made at trial since it was unacceptable to both the State and the trial judge. The appar-

ent purpose of defendant's offer was to foreclose the State from further prosecution on grounds of double jeopardy and to give the court the sentencing option of probation. Had defendant been convicted of involuntary manslaughter only, probation would have been an available option, but not so if she stood convicted of either murder or armed violence. Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3(c)(2).

The trial court premised its decision to refuse the plea on the ground that the State would be prevented from further prosecution of the greater charges on double jeopardy grounds if it accepted the plea to the lesser offense. Without expressing an opinion on whether the trial court's assumption was correct, we find no merit to defendant's belief that she is given the option of choosing the offense for which she is prosecuted.

Defendant appears to argue that there is both a constitutional and a statutory right to have a proferred plea accepted. Citing *People v. Whitfield* (1968), 40 Ill. 2d 308, 239 N.E.2d 850, defendant argues that she was entitled, as a matter of due process of law, to have the trial court accept her guilty plea.

Defendant's reliance on *Whitfield* is clearly misplaced. *Whitfield* held that defendant's counsel's failure to inform him of a plea offer of the State was a violation of his right to make fundamental decisions of trial strategy. *Whitfield* did not hold that a defendant has a due process right to plead guilty, but only a right to be advised of the State's offer to allow the defendant to plead guilty to agreed offenses.

Defendant's contention as to due process is contrary to case authority. In *Santobello v. New York* (1971), 404 U.S. 257, 262, 30 L. Ed. 2d 427, 433, 92 S. Ct. 495, 498, the court stated:

> "There is, of course, no absolute right to have a guilty plea accepted. *Lynch v. Overholser* [(1962)], 369 U.S. 705, 719, [8 L. Ed. 2d 211, 220, 82 S. Ct. 1063]; Fed Rule Crim. Proc. 11. A court may reject a plea in exercise of sound judicial discretion."

See also *United States v. Jackson* (1968), 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209; *People v. Morgan* (1973), 14 Ill. App. 3d 232, 302 N.E.2d 152; *People v. Boyd* (1978), 66 Ill. App. 3d 582, 384 N.E.2d 414, *appeal denied* (1979), 75 Ill. 2d 591.

Defendant cites section 113—4 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 113—4) and contends:

> "Illinois guarantees the right of a defendant to plead guilty to an offense for which he or she is charged."

Section 115—2 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1981, ch. 38, par. 115—2) details the prerequisites for accepting a guilty plea, but nowhere requires the court to accept a plea.

The material portion of this section states that "(a) [b]efore or during trial a plea of guilty may be accepted when: ***." The standard of reviewing a trial court's refusal to accept a guilty plea is simply whether the refusal was an abuse of discretion. *People v. Boyd* (1978), 66 Ill. App. 3d 582, 384 N.E.2d 414.

In *People v. McCollough* (1974), 57 Ill. 2d 440, 313 N.E.2d 462, and *People v. Rhodes* (1967), 38 Ill. 2d 389, 231 N.E.2d 400, it was held that the State's Attorney has the discretion to charge the most severe offense violated by a person's acts in a single transaction despite the fact that several statutory offenses are applicable to the same conduct and provide different penalties. Section 3—3 of the Criminal Code of 1961 also grants the State broad charging discretion. The section provides:

"(a) When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense." Ill. Rev. Stat. 1981, ch. 38, par. 3—3.

Defendant's suggestion that these authorities do not address the question here, *i.e.*, whether a defendant has a right to plead guilty, overlooks the point made by *McCollough* and *Rhodes*. These cases clearly hold that a person can be prosecuted for the greatest offenses violated by his conduct and defendant's attempts to eliminate this option of the State is contrary to the rationale of these decisions.

Supreme Court Rule 402 (87 Ill. 2d R. 402) refers to the circumstances under which the trial court may "accept a plea of guilty" and in subparagraphs (d) and (e) provides that where the prosecution and the defendant have agreed upon the terms of a guilty plea, the trial court may accept the plea or decline to do so. The Committee Comments to the Rule clearly reflect the interpretation that the trial court may concur, concur conditionally, or decline to accept the terms of the agreed plea. We find no rationale which suggests that the legislature intended to create a statutory right requiring the acceptance of a proferred plea of guilty as to a charge chosen by a defendant.

We find no abuse of discretion in the trial court's refusal to accept defendant's guilty plea which had as its purpose the placing of a bar to further prosecution for offenses believed by the prosecutor to have been committed by defendant.

■■ Defendant next argues that the trial court erred in failing to declare a mistrial for the prosecutor's violation of a discovery order.

At trial and prior to the defendant's examination of Dixie Fernetti, the prosecutor informed the court that he possessed a statement made by defendant's husband the day following the shooting. In

the statement defendant's husband related that he might have shown defendant how to use the bolt action pellet rifle sometime before the shooting. Counsel for the defendant immediately moved for a mistrial, claiming surprise and prejudice in light of the fact that the defense was premised on defendant's lack of knowledge of weapons. The motion was denied, but counsel was given a chance to talk with Dixie and defendant before direct examination proceeded. Defendant claims that the trial court abused its discretion in denying her motion for mistrial. The State argues that counsel has shown no prejudice, but concedes that the discovery order was violated.

The determination of the proper sanction to invoke when a discovery violation has occurred is within the trial court's discretion, and a reviewing court will not interfere with the court's sanctions in the absence of prejudice. (*People v. Wilken* (1980), 89 Ill. App. 3d 1124, 412 N.E.2d 1071.) The proper sanction to apply in a given case for a violation of the discovery rules should be fashioned to meet the circumstances of the case with due regard to the prejudicial nature of the testimony and with the ultimate object to compel discovery. *People v. Jackson* (1977), 48 Ill. App. 3d 769, 363 N.E.2d 392.

The statement at issue was consistent with Dixie's trial testimony that he was not sure if he had shown defendant how to use the pellet gun and was immaterial in any event since the issue at trial was not whether the defendant knew how to use the gun but her knowledge of the capabilities of the weapon. Defendant's lack of knowledge of the particular weapon does not vitiate to any extent her testimony indicating that the gun was a powerful weapon, and that she knew this fact. In view of defendant's opportunity to review the discovery material prior to the direct examination of the witness, its minimal probative value, and no evidence of prosecutorial bad faith in its nondisclosure, we cannot say the trial court abused its discretion in granting a short recess, rather than declaring a mistrial.

At the outset of the prosecutor's cross-examination of defendant's psychiatrist, the prosecutor asked Dr. Colen if he had ever used a former name. The witness responded that his former name was spelled Cohen. Defendant's objection to this questioning was overruled and she now argues that this line of inquiry interjected racial prejudice into the case and denied her a fair trial. In reply, the State strenuously denies that it had a motive to discredit the witness' race.

It cannot be doubted that the court and jury should receive information of the present name of a witness so as to enable them to identify the witness and remember his testimony (*People v. Berlin* (1979), 75 Ill. 2d 266, 388 N.E.2d 412), but where the prosecutor introduces a

witness' prior name to discredit his testimony by injecting ethnic innuendoes, it is clearly improper. Several decisions have condemned the interjection of ethnic comments into a case, some so outrageous as to require a new trial. See *People v. Grizzel* (1943), 382 Ill. 11, 46 N.E.2d 78; *People v. Lurry* (1979), 77 Ill. App. 3d 108, 395 N.E.2d 1234; *People v. Turner* (1977), 52 Ill. App. 3d 738, 367 N.E.2d 1365.

At bar, the questioning of the witness was not an apparent reference to his Jewish race, and in a bench trial the presumption has long been followed that the court considers only proper argument and evidence unless the record demonstrates otherwise. (*People v. Pagan* (1972), 52 Ill. 2d 525, 288 N.E.2d 102.) Nothing in the record persuades us that the trial court was influenced by the witness' race in considering his testimony. The situation here is indistinguishable from *People v. Harris* (1945), 391 Ill. 358, 63 N.E.2d 398. In *Harris*, defendant was cross-examined with reference to whether he had ever gone by the name of Lester Cohen. The argument that this cross-examination interjected racial prejudice into the proceedings was dismissed by the supreme court as without merit.

Finally, defendant argues that the trial court's findings in mitigation were contrary to the evidence offered at the sentencing hearing. We agree, but find no prejudice here. Had the court found the evidence to support all of the factors in mitigation listed in section 5—5—3.1 of the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.1), no different result would obtain since the sentence defendant received was the minimum provided by statute. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1.) Defendant was not eligible for the sentencing options of probation, periodic imprisonment or conditional discharge since she stood convicted of a Class X felony (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3), and any error in the trial court's findings on the factors in mitigation could not have prejudiced her.

Defendant's conviction of armed violence and her sentence thereon are affirmed.

Affirmed.

WEBBER, P.J., and MILLER, J., concur.