THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID HENDRICKS, Defendant-Appellant.

Fourth District No. 4—85—0141

Opinion filed June 19, 1986.

74

78

Jon R. Waltz, of Chicago, and Mercer Turner, of Bloomington, for appellant.

Ronald C. Dozier, State's Attorney, of Bloomington (Kenneth R. Boyle, Robert J. Biderman, Denise M. Ambrose, and David E. Mannchen, all of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MORTHLAND delivered the opinion of the court:

A jury found defendant guilty of the murders of his wife and three children. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1.) The trial court sentenced him to four consecutive terms of natural-life imprisonment and imposed a fine and costs. Defendant appeals his conviction and sentence. We affirm.

Defendant argues that he was not proved guilty beyond a reasonable doubt and that the trial court erred in: denying his motions for directed verdict; ruling that prior acts evidence was probative of motive; admitting motive evidence, the prejudicial effect of which outweighed its probative value; failing to sequester the jury; taking judicial notice that the IBM/PC is a standard business machine; ruling that the State's specific-motive theory was not discoverable; denying defendant's motion to suppress his prearrest statements; and restricting cross-examination of witnesses. Finally, defendant argues that the trial judge was biased against him and the sentence imposed constituted cruel and unusual punishment.

During the late evening hours of November 8, 1983, police officers discovered the bodies of Susan, Rebekah, Grace, and Benjamin Hendricks. All, but Rebekah, had sustained multiple injuries to the head, neck, and upper torso, causing near instantaneous death. Rebekah had sustained a single skull fracture. Police officers found the children's bodies in the southwest bedroom. Rebekah was in one bed; Grace and Benjamin in the other. The beds were 22 inches apart. Officers found Susan's body in the master-bedroom bed, with the bed clothing pulled down around her shoulders. None of the victims, who were dressed in pajamas or nightgowns, bore evidence of defensive wounds. On December 5, 1983, informations issued alleging David

Hendricks, defendant, knowingly or intentionally caused the victims' deaths. Susan was defendant's wife. Rebekah, Grace, and Benjamin were his children. On December 27, 1983, the informations were nol-prossed and replaced with indictments.

Defendant and Susan were married in 1973, shortly after defendant received his associate's degree in orthotics and prosthetics, the study of the fabrication and fitting of artificial body supports and limbs. Susan and defendant were members of a nondenominational religion, the Plymouth Brethren. In 1982, defendant moved to 313 Carl Drive in Bloomington. Defendant's orthotics and prosthetics practice prospered. He developed and patented his own brace, the cruciform anterior spinal hyperextension (CASH) orthosis. In November 1981, defendant sold the patient care and fitting portion of the business to Edward Roman, telling employees that he was selling the patient-care portion of the business so that he could spend more time with his family. The offices of the patient-care portion of defendant's business were located a few blocks away from his Bloomington home and contained a laboratory and fitting rooms. Defendant had keys to this office and used its facilities for product development.

In November 1981, defendant started a new business, CASH Manufacturing, which he incorporated. He and his office manager, Beverly Crutcher, were its principal employees. Crutcher testified that she processed orders for the brace, which was sold mail order, and provided secretarial and bookkeeping skills. On November 3, 1983, defendant told Crutcher that he was going to make a sales trip to central Wisconsin and north-central Illinois. He and Crutcher compiled a list of prospective clients from telephone books and old client order forms. Crutcher gave the list to defendant either on Monday, November 7, 1983, or on Friday, November 4, 1983. On Monday, defendant told Crutcher that he was going to leave at midnight and drive straight through, calling on customers in the morning. This was the only time Crutcher could remember defendant informing her specifically of his proposed departure time. However, defendant had indicated before that he left at night. Defendant flew if the trip were to a metropolitan area or if the drive would take longer than eight hours.

Defendant left the office at approximately 4 p.m. He had previously agreed to babysit while Susan attended a baby shower in Delavan, about 35 miles west of Bloomington. Defendant called the children in from playing at approximately 5:30 p.m. Defendant stated that after he arrived home, he worked on his motorcycle, readying it for winter storage. He then rode his motorcycle to his airplane hangar and jogged home. Susan left between 5:50 p.m. and 6 p.m.

Defendant and the children arrived at Chuck E. Cheese Pizza Time Theater at 6:30 p.m. and ordered a medium vegetarian pizza and a pitcher of root beer. The pizza would have been built, baked, and ready for consumption within 10 to 15 minutes. A medium vegetarian pizza is cut into 10 slices. It consists of dough topped with cheese, sliced mushrooms, green pepper, olives, tomato, diced onions, and sauce.

The restaurant provides a play area which contains an airbounce pillow, rope slide, video games, rides, and a playhouse, a room filled with balls. Generally, children who are under 4 feet 6 inches tall may enter playland upon payment of five tokens. Ordinarily, employees stamp children's hands with cartoon characters, once they have paid the admission price.

Defendant provides the only testimony about his and the children's activities on November 7. The children all entered playland, vigorously using the equipment. Defendant observed them, then watched television until picking up the pizza at 7 p.m. He remembered thinking the pizza took a long time to bake. They ate between 7 p.m. and 7:15 p.m. Defendant ate one piece; the children consumed the balance and drank root beer. The children ate very quickly; then, they returned to playland. Defendant watched television and the children until 7:30 p.m., when he told them it was time to leave. They wanted to continue playing. Therefore, he left them in the play area while he left the pizza parlor and put gasoline in his car. He returned to the pizza parlor at 7:50 p.m., stating that he rushed the children out to the car.

He and the children rushed to the bookmobile located at Carl Drive and Wellington Way. The children selected books while he helped the attendant fill out a card request for Benjamin. Defendant and the children left the bookmobile between 8:15 p.m. and 8:30 p.m. They played two rounds of hide and seek for 20 minutes before going to bed between 9 p.m. and 9:30 p.m. Defendant then read to the children for 15 to 30 minutes. The bookmobile attendant stated defendant and the children left between 8:10 p.m. and 8:15 p.m. Defendant testified further that Susan returned at 10:30 p.m. After talking to her for approximately 20 minutes, he left. It was then 11 p.m. or shortly thereafter. Defendant admitted, however, that it was possible he told Detective Crowe that Susan had arrived home at 10:45 p.m. and that he had talked to her for an hour.

Rodney Blair, foster son of Robert and Debbie Phillips and defendant's next door neighbor, testified that soon after 9 p.m. on November 7, he walked outside to Jeffrey Monahan's truck, which was

parked in the driveway. He saw defendant, in his car, backing out of his driveway and onto Carl Drive. Defendant, who was alone in the car, proceeded north, turning onto Wellington Way. Jeffrey Monahan, corroborated Blair's statement. Defendant during cross-examination denied leaving his house at or near 9 p.m.

Susan left the baby shower at approximately 9:40 p.m. Her mother testified that Susan took a snack plate with raw vegetables, cheese, and crackers on it and ate two cookies as she was leaving the party. Test drives resulted in a total trip time of 52 minutes and 51 seconds. These times would have placed Susan at 313 Carl Drive at approximately 10:33 p.m.

On November 8, defendant made a series of sales calls in Wisconsin. All of the prospective customers agreed that cold calls, sales calls without appointments, are common and that the new model of defendant's brace was a significant improvement. All current purchasers of the brace, purchased it mail order. However, they agreed that defendant could benefit from personal sales calls because of competition in the field. Defendant did not bring either model of his brace with him on the sales calls, stating he did not have the brace with him. A subsequent search of his car revealed that he had both models of the brace with him. Defendant told two prospective customers that he was on an extended vacation and wanted to see people who were using or going to use his brace.

Harvey Borgwardt, the owner of Aljan Company, in Madison, Wisconsin, testified that defendant stopped at his business between 1 p.m. and 1:30 p.m. on November 8. Aljan Company is a major distributor of the CASH orthosis. Borgwardt identified his business card and stated that he may have left the card at defendant's booth in Phoenix. It was possible, however, that he gave defendant the card on November 8. Borgwardt thought defendant mentioned driving all night. The business card had written on it that Borgwardt had seen the new brace in Phoenix and liked the swivel. Harold Donald, a certified prosthetist, employed by Aljan Company, visited with defendant between 1 p.m. and 1:30 p.m. on November 8. Defendant and he chatted about personal matters. Defendant mentioned that he had driven all night and usually stayed up all night once every week.

Defendant, at trial, testified that he left home at 11 p.m. or shortly afterwards on November 7. He made three stops en route, each for no more than 15 minutes. First, he stopped at a restaurant for coffee to go. He then took Route 51 north. His next stop was at a restaurant south of Rockford, Illinois. Defendant did not recall the name of the town or the restaurant. He then stopped at a rest area

on I-90 or North 51, where he changed clothes. At approximately 7 a.m., he arrived at Stevens Point, Wisconsin, where he stopped at a Hardee's restaurant and ate breakfast. A timed receipt from the Stevens Point Hardee's, showed defendant placed a to go order at 7:17 a.m. Defendant testified that he ate his breakfast at the restaurant. Defendant stated he drove on the trip because he was stopping in several towns.

Defendant made several telephone calls to the Bloomington area on November 8. He testified that all calls were made on his credit card. He called Crutcher at 8:30 a.m. at the office. He usually called when he was on a trip. Crutcher stated that there was nothing unusual about the content of the conversation. Defendant often had her call Susan to save the long-distance charge. Defendant stated that he tried to call his wife at approximately 11 a.m. but received no answer. His next calls were placed from his hotel room. At 3 p.m. he called home. Approximately one hour later, he called Crutcher at work. He asked Crutcher to call Susan for him, because he had called twice and been unable to reach her. Crutcher placed three calls to the residence. The parties stipulated to the accuracy of telephone records and testimony about them. The records show defendant called his residence at 3:01 p.m., 5:31 p.m., and 5:33 p.m., but the calls were not answered.

Defendant, at 5:35 p.m., called Crutcher's residence but reached her sister. At 5:38 p.m., defendant called the Nathan and Mary Ann Palmer residence in Delavan. The Palmers, defendant's brother- and sister-in-law, had invited defendant and his family to a dinner with other family members on November 8. Defendant asked Mary Ann if Susan was there, telling her that he had been unable to reach Susan. He then gave Mary Ann his phone number, asking that she have Susan call him. Defendant assured her that nothing was wrong, but he asked that she call back in 30 minutes, if Susan had not arrived. Prior to defendant's call, the Palmers thought defendant was coming to dinner. Susan's mother testified that she forgot to tell them that defendant would be unable to come.

At 5:43 p.m., defendant called his next-door neighbor's residence. He talked to Karen Cramer, asking her to ring the front doorbell. He explained that he had been trying to reach Susan and believed the phone was out of order. Cramer rang the bell but received no answer. At 6:15 p.m., Nathan Palmer called defendant back, reporting that Susan had not arrived. Defendant told him not to worry; she was probably running errands. After calling defendant, Nathan called other relatives to see if anyone had seen Susan. At approximately 9 p.m., he and his brother-in-law, Gerald Buchanan, went to look for

Susan.

Defendant telephoned the Cramers' residence again at 6:31 p.m.; Karen reported her lack of success. At his request, she tried to reach Susan again and then called him back. Defendant reassured her. However, he asked for the police department's telephone number. Defendant telephoned the police department, stating that he had been unable to reach his wife and feared she might have been involved in an automobile accident. The police department referred him to the State police. The State police told him no accidents had been reported. Defendant stated that he was worried. Therefore, he started home at 7 p.m. or 7:10 p.m., telling the hotel clerk that an emergency situation had developed. At 9 p.m., defendant called the Cramer residence again, telling John Cramer that he would arrive home at around 11 p.m.

Nathan Palmer and Gerald Buchanan arrived at 313 Carl Drive at approximately 10:30 p.m. Officer Michael Hibbens and Detective Michael O'Brien arrived a short time later. Hibbens tried the screen door to the back of the house. The door was closed, but not locked. He walked onto the porch and entered with O'Brien through the sliding glass patio door, which was shut but not locked. Palmer and Buchanan waited outside. Hibbens discovered the bodies of the three children. O'Brien discovered Susan's body. The officers touched only the stairway light switch and light switch in the children's bedroom.

Outside, O'Brien told Buchanan and Palmer that Susan and the children were dead. Buchanan asked if there had been a gas leak. O'Brien said no. All of the doors to the upstairs rooms were open, a chest of drawers was tipped forward in a bedroom adjacent to the girls' bedroom, drawers were pulled out, and areas of the house were disordered. The garage had not been disturbed.

After arriving home at 11 p.m., defendant went to the Cramers' residence. Detective Charles Crowe arrived at 11:30 p.m. and asked John Cramer if there was a private place where he and another detective could talk to defendant. Cramer suggested the master bedroom. At this time, Crowe knew that Susan and the children were dead and that defendant returned from Wisconsin after discovery of the bodies. Crowe interviewed defendant from 11:30 p.m. to 12:40 p.m. According to Crowe, defendant told Crowe that he left home on Monday at about midnight, driving to Wausau, Wisconsin, for business. It was normal for him to leave on business trips at night, since he usually worked through the night once every 7 to 10 days. Usually, he left at 2 or 3 a.m. and flew. However, he left earlier this time because he was driving. When he left, the victims were in bed. Crowe asked

defendant about locking the doors. Defendant responded, "I think I remember latching the back patio door. The front door was locked. I think it was locked. I always check it." Defendant stated that he stopped at a local restaurant for coffee to go before leaving town. He stopped one other time to change clothes at a rest stop.

Crowe further testified that defendant volunteered information about the times and locations of his sales calls and recounted his attempts to reach Susan. Defendant said he made his first call home at 11:30 a.m. from a hospital in Portage, but received no answer. Defendant's statements about the rest of the calls were consistent with his trial testimony.

After obtaining defendant's consent to search his automobile, business, airplane, and airplane hangar, Crowe conferred with Sergeant Eugene Irvin, who was in charge of the investigation. Crowe then specifically asked defendant whether he had any hatchets or knives in the house. Defendant said that he had an old ax in the garage, and did not have any hunting knives. Defendant agreed to go to the police station for further questioning. The police drove defendant to the station in an unmarked car and arrived at the station at approximately 1 a.m. Defendant was not handcuffed or searched. The police offered defendant a cup of coffee and left him alone until 2:35 a.m., at which time Crowe and O'Brien initiated a second interview.

Crowe testified that defendant reiterated several of his earlier statements. Defendant additionally stated that he and Susan were happily married and had discussed adopting a boy for an hour before he left on November 7. She had returned from the shower at approximately 10:45 p.m. Around midnight, he got out of bed, embraced and kissed Susan, who was awake, and entered the children's bedroom. He kissed them as they were sleeping. Defendant did not specifically remember checking the doors, but he said it was his habit to check them and make sure the locks were in place and wooden security bar, which he had made, was down on the patio door. The garage door had an automatic opening device and could not be opened manually. He had one of the garage-door openers in his car and Susan had the other. He left through the garage door. Susan would not have opened the door to a stranger after he left.

Irvin spoke to defendant later. Defendant told Irvin he could think of no one who had reason to commit the offenses. The only items of value in the house were a microwave and perhaps a couple of hundred dollars. His ax was an old red-handled one. The police did not discover any physical evidence linking defendant to the offense.

Defendant, during his trial testimony, stated that it was possible

he made the statements Crowe recounted. However, he left at 11 p.m. He did not talk to Susan for an hour before leaving or say that it was his habit to make sure doors were locked. He agreed that he may have told Crowe that Susan arrived home at 10:45 p.m. It was also possible and correct that he told Crowe that he called home at 11:30 a.m. on the next day. Possibly, he told Crowe that all the calls were on his calling card.

At about 5 p.m. on November 9, defendant spoke to the media. During the interview, a reporter asked defendant whether anything was missing from the house and whether he knew the motive for the slayings. Defendant responded that he had not been in the house but, "They said that some things looked like some things were taken." At trial defendant did not state that anything was missing from the house.

In rebuttal, O'Brien, all of the police officers, and the coroner's office personnel denied saying that the house looked as if some things had been taken. In surrebuttal, Nathan Palmer, defendant's brother-in-law, stated that O'Brien on November 8, between 10:30 p.m. and 11 p.m. told defendant, in Palmer's presence, that he could not enter the house and that it looked as if the house had been ransacked. Palmer admitted that he did not recall this part of the conversation before his prior testimony in the State's or in defendant's case in chief. His mother reminded him of it.

The State introduced extensive testimony about its investigation and analysis of the house, defendant's belongings, items seized, and defendant's vehicles. In summary, no bloodstains were found on defendant, any of his clothing, or his vehicles. Defendant's fingerprints were not found on the red-handled ax or knife which were found with their blades aligned at the foot of the bed in which Grace and Benjamin had been killed. There were no prints or stains on their handles, which had been thoroughly cleaned. Very little blood was found in the house, absent that found in the children's bedroom. Only the southwest bedroom, the children's room, showed evidence of blood spattering around the walls. The police found both models of the CASH orthosis in defendant's car and a briefcase. The briefcase contained a number of papers, including a receipt for gasoline, business cards obtained during the sales trip, and a breakfast receipt from the Stevens Point Hardee's.

Dennis Dodwell, Rodney Wamsley, and Tommy Martin, crime-scene technicians, processed the house. A butcher knife was missing from the knife block on the kitchen counter. The wooden block was upright and aligned with the edge of the cabinet. Some of the rooms

of the house appeared to have been ransacked. There were no pry marks or scrapes on the frame of the sliding glass door at the rear of the house and no indication that it had been compromised. The locking mechanism was on the inside; there was no exterior keyhole. Dodwell testified that he locked the door from the inside and unsuccessfully attempted to open it. The sliding glass door had a wooden bar that would lie across the door as an extra security device. The only other entrances to the house were from the garage or the front door. The door leading from the garage to the house was open, but the garage door itself was down and could not be opened manually. The front door was locked. None of the windows, doors, or locks showed signs of forced entry. However, the sliding glass door was unlocked.

Dodwell tested the house with luminol, a chemical mixture which fluoresces upon contact with blood or trace amounts of blood. In the southwest bedroom, the south wall, around and inside the closet, the face of the dresser and the mirror located against the north wall, the beds, and the floor reacted. A few bluish droplets reacted in the hallway bathroom on the vanity. A smear also reacted on the vanity by the sink. The entire bottom of the tub reacted and a 2- to 3-inch spot at the back of the tub, approximately 5 feet from the floor, reacted.

In the master bedroom, the bed reacted. The handles of the dresser in the master bedroom also reacted. Dodwell stated that luminol reacts to copper or carbon alloys in the handles. He admitted that luminol also reacts to radishes, bleach, Cascade, Snowbol, and other similar cleaning items. It does not react to cold creams, toothpaste, shaving creams, cologne, bath soaps, or similar products. No other areas of the house, including the upstairs carpet and the bathroom in the master bedroom, reacted to the chemical. Luminol is a preliminary test for blood; it will not positively identify blood. Therefore, Dodwell could not conclude that the luminescence in the tub and shower in the hallway bathroom near the children's bedroom was caused by the presence of blood. Blood was not spread throughout the house.

Serology tests confirmed the presence of human blood on the vanity in the hallway bathroom, on a headboard spindle in the master bedroom, and in 17 locations in the southwest bedroom. Extensive amounts of blood were found on the beds and the bed clothing. Except for the head of the ax, blade of the butcher knife, victims' sleeping garments, beds, and the bed clothing, no blood was found in the rest of the house. All of the victims had type A blood. Human blood, type A, and hair fragments, consistent with samples taken from Ben-

jamin and Rebekah, were found on the head of the ax and the blade of the butcher knife.

There was a cut or tear 22 inches from the top edge of the bedspread in the master bedroom, which was consistent with being caused by the ax. However, the State's expert could not positively determine what instrument caused a V-shape cut or tear and several small defects near the top edge of the spread and near the edge of the sheet beneath the spread. Dodwell agreed that a figure portrayed in a photograph appeared to be a matchstick and remembered examining a sliver of wood on the stairs leading to the second floor, but he did not collect it. There were no tobacco products or ashtrays in the house. However, there was a fireplace.

Dodwell stated that, based upon a blood-spatter analysis, the assailant stood between the children's beds at the time of the attack on Grace and Benjamin. Dodwell noted minimal blood on the ceiling. However, he found blood spatters on and around the room except in an area which could be blocked by a person standing between the beds. He also found a blood spatter inside a shoe wedged under one of the pulled-out drawers. No blood spatters were found on the clothing inside the drawers, but the face of the drawers were spattered with blood. The assailant was spattered with blood as a result of the attack and searched the room after the attack.

There was a significant amount of dried blood on the weapons when Dodwell examined them. He did not have an opinion about the order of the victims' deaths. However, he admitted that castoffs would have been found in the master bedroom had the ax been bloody when Susan's injuries occurred. Dodwell stated that a blanket had been pulled over Susan's face and head prior to the attack. His opinion was based upon the absence of spatters in the master bedroom, position of the victim, defects in the bed clothing, and position of the bed clothing.

Alexander Mankevich, a latent-print examiner, testified that only 12 items recovered as evidence from the house contained fingerprints suitable for comparison. Those 12 items were: a guestbook from a stand in the living room, Susan's purse and seven items that comprised the contents of the purse, a cup and saucer from the kitchen counter, and a bottle of strawberry wine from the top of the refrigerator. Three of the seven fingerprints found on the guestbook matched those of defendant, Grace, and Benjamin. The remaining four prints were not identified. Except for a checkbook, bearing Susan and defendant's names, the only prints found on Susan's purse and its contents, including the wallet and four credit cards inside the wallet,

were Susan's. Defendant's left palm print was found on the cover of the checkbook. Susan's prints were inside the checkbook. Susan's prints were on the cup and saucer. Eight of the ten prints on the wine bottle were defendant's; the other two prints were not identified. No fingerprints were found on the ax or the butcher knife.

Very few latent prints were found in the house. Two did not have sufficient detail for comparison. One was Benjamin's palm print. Two latent fingerprints, lifted from the telephone receiver in the kitchen, were unidentified. Two partial shoe prints, one from near the sliding glass door and the other from the floor between the kitchen table and basement door, were unidentified. Mankevich testified that there is no method of determining when finger and footwear impressions had been made.

Martin, a field supervisor for the Department of Law Enforcement, testified that a burglary had not occurred at the scene. However, he admitted that in some ways the scene was consistent with a burglary. Martin stated the scene was inconsistent with victims interrupting a burglary. The victims did not have defensive wounds, and their positions indicated that they were asleep when killed. Martin agreed that it was possible that one or more people could have walked in and not necessarily forced entry. Those persons could have left unidentified foot and fingerprints. Assuming money was missing, Martin's opinion would not change. People staging burglaries may take or report items missing.

Antonie Romyn, coroner's physician for McLean County, testified that he performed autopsies on Susan, Grace, Benjamin, and Rebekah Hendricks, on November 9, 1983. Romyn followed the same procedure in examining the victims. After examining Susan's digestive organs *in situ*, Romyn removed them. He cut a window or small opening in the stomach, then ladled out the stomach contents, which he gave to an assistant coroner. The stomach contained 20 milliliters of a thick, greenish fluid. Its odor indicated the early stages of decomposition. The duodenum and bowel contained a thick, gray-black fluid.

Romyn stated Susan received a severe blow to the left side of her skull. The skull did not fracture; however, the brain was forced upward and to the right, causing a hemorrhage on the right side of the brain. The left strap muscles, muscles over and around the voice box, showed evidence of hemorrhage. After examining the hyoid bone, the bone beneath the tongue, and the strap muscles, Romyn concluded that Susan had not been strangled. The nine external injuries were consistent with a sharp, heavy ax-like weapon. Death could have been caused either by massive blood loss from the neck injuries or by the

swelling of the brain. Either would have rendered Susan unconscious or dead within 20 minutes, probably less.

Grace and Benjamin had a cartoon character, Jasper T. Jowls, stamped on their hands.

Romyn next performed autopsies on the bodies of Grace, Benjamin, and Rebekah. Their injuries were consistent with being caused by the ax and knife found at the scene. Romyn removed 70, 60, and 100 milliliters of gastric contents from each child, respectively. The samples contained heavy particulate matter, smelled like pizza, and contained readily identifiable pieces of mushroom, green pepper, tomato, and onion. Near instantaneous death resulted from the children's injuries.

Romyn kept the stomach contents free from contamination by holding the duodenum closed with his hand as he ladled the contents out of the stomach. There was no aspiration of stomach contents. He noted no evidence of disease or abnormalities in the victims. The children were the appropriate height and weight for their ages, 7, 5, and 9 years old. He did not see any bolus, clumps or masses of food, in examining any of the victims. None were sexually assaulted or strangled.

The People presented four expert witnesses in an effort to establish the times of the victims' deaths: John Spikes, a certified laboratory technologist and chief toxicologist with the Illinois Department of Public Health; John Duncan Dwyer, who had been a professor of systemic biology (botany) at St. Louis University for 30 years; Joseph Davis, a board-certified forensic pathologist and chief medical examiner for Dade County, Florida; and Michael Baden, a board-certified forensic, anatomic, and clinical pathologist and deputy chief medical examiner for New York City. Baden and Davis examined the victims' stomach contents and testified to the approximate time of death based upon their examinations. Spikes examined all material from the children's stomachs and found the material from each child to be similar in condition and coloration. It was his opinion that very little active digestion had occurred. Spikes could not state the degree to which the food had been subject to digestion in mathematical terms. Dwyer, having examined the stomach contents of each child, concluded that the vegetable matter appeared to be fresh, with little eroding of the edges. This indicated the material had not deteriorated to any great extent.

Davis also explained the basic process of digestion. He pointed out that many factors can affect digestion; severe emotional trauma, strenuous exercise, and some physical diseases may delay digestion.

Davis testified that digestion stops at death. He stated that the pizza eaten by the children would have been completely digested within three to four hours of consumption. It was Davis' opinion that the children died after 8:30 p.m. but before 11:30 p.m.

Baden testified that he had personally performed 15,000 autopsies since 1956 and examined gastric contents in every one. For over two years he had specifically studied gastric-emptying time and digestion. Baden also examined samples of the children's stomach contents. It was his opinion that they consumed their last meal approximately two hours prior to their deaths and had died at approximately the same time. He stated that the fact that the samples from each child were similar both as to volume and condition helped exclude individual digestive variations.

The defendant presented five experts' testimony on the same question: Ross Eugene Zumwalt, an anatomic and forensic pathologist; Earl Rose, a clinical, anatomic, and forensic pathologist, as well as an attorney; Frederick Albert Jaffe, a certified forensic pathologist; Robert Stein, a certified forensic and anatomic pathologist; and Charles Petty, a certified anatomic, clinical, and forensic pathologist. Zumwalt did not believe gastric analysis was useful in determining an exact time of death. He gave as his opinion that the deaths could have occurred as early as 9 p.m. and as late as 2 a.m. Rose testified that gastric analysis could be used to establish broad ranges of time during which death could have occurred. However, digestion and gastric emptying were relative to the start of the digestive process. Jaffe stated that gastric analysis was not a reliable method of fixing a range of time of death and was useless in stating a time of death with any degree of precision. He stated it was possible that the children died before 12 a.m. and equally possible that they died between 12 and 2 a.m. However, Jaffe thought it was less possible that they died between 2 and 4 a.m.

Stein testified that in the instant situation gastric contents could not provide a reliable means for determining the time of death because of the circumstances of the case. However, gastric analysis might be used in an appropriate case to establish perimeters for the time of death. Petty testified that analysis of stomach contents could not establish the time of death, but he conceded that a difference of opinion exists among pathologists in this area.

The State then presented a number of witnesses to establish that a conflict between defendant's changed life-style, increasing sexual assertiveness, religious beliefs, and marital situation led to the victims' deaths. Defendant objected during and before trial to motive evi-

dence. Several neighbors described Susan as a quiet, reserved, unstylish woman, who always wore dresses or skirts and did not style or perm her hair. She did not wear jewelry, other than her wedding ring, and never wore cosmetics. Neighbors described defendant as outgoing, friendly, a person who jogged, greeted new neighbors, and helped out. Various witnesses described defendant's appearance and a change in it from 1981 to 1983. The court ruled that testimony about defendant's post-November 8, 1983, appearance was not relevant. In 1981 and early 1982, defendant was overweight, wore a mustache, ill-fitting clothes, and greasy looking, unstyled hair. In 1983, he was 40 pounds thinner, had styled his hair, did not wear a mustache, and wore better-fitting clothes.

The People presented a number of witnesses who recounted their experiences with defendant in preparation for modeling the CASH orthosis. Initially, defendant's conduct was professional, the fitting sessions were brief, and they were conducted in the presence of others.

In the spring of 1981, with Diana Payne and Cindy Baird Segobiano, defendant began to require partial nudity and started measuring and marking the models' torsos. By March 1983, defendant was meeting models outside of office hours. Cathy Harper testified that she met defendant at his office in the late afternoon. He informed Harper she would need to remove her outer garments and bra for a proper adjustment of the brace. Defendant then complemented Harper on her figure and inquired about her social life.

In the summer of 1983, defendant approached Nancy Jarrett at 5:30 p.m. at her apartment. She did not know defendant but agreed to model for him and agreed to a fitting session later that evening. Although Jarrett's apartment is on the second floor of a building and shielded from outside view, defendant closed her draperies. He told her she would need to be topless and made multiple marks beneath her breasts and on her torso.

In the late summer of 1983, defendant approached Lee Ann Wilmoth at her apartment at 8:30 in the evening. Once Wilmoth agreed to model, defendant told her that a fitting session was necessary and that he needed to measure her while she was wearing only panties. She was uncomfortable with the prospect so wore a bathing suit bottom and long robe. Defendant opened the robe and made several marks on Wilmoth's torso. While she was modeling a leotard for defendant, he remarked that she had an asymmetrical frame. As Wilmoth lay on her bed, defendant ran his fingers over her torso and massaged her shoulders and neck, touching her breasts. Wilmoth rebuffed defendant's attempt to kiss her, and defendant repeatedly apol-

ogized, returning once to her apartment to do so. Additionally, defendant suggested they meet at a local lounge-restaurant.

In October of 1983, defendant met with Carla Webb at 7:15 p.m. at his offices. Initially, he strapped the CASH brace on over Webb's leotard, then, told her it would not fit properly. She stood straight, and defendant told her the brace would fit but needed adjustment because of her good posture. Defendant assured Webb that nude fittings were standard procedure and she would be treated the same as any other patient.

Once Webb removed the leotard and donned a hospital gown, defendant made at least 25 marks on her back with a felt-tip pen. She reversed the gown, and defendant made at least 20 marks on and around her breasts. She stopped defendant, who was perspiring and who would not make eye contact with her, as he started to mark the center of her breasts. Defendant strapped the brace on Webb but told her she had scoliosis. He then touched her breasts, attempting to kiss her. After she rebuffed him, defendant told her that he was a good Christian, his wife could not find out, and perhaps he could take her to Kentucky in his plane. He asked her to call if she wanted to talk and contacted her several times.

In late October 1983, Tammy Ledbetter and Elizabeth Tomlinson modeled for defendant at a convention in Phoenix. The fitting sessions took place in defendant's hotel room. Defendant had Ledbetter remove her leotard and bra and hold her arms out to her sides. He made multiple markings on both sides of her torso but told her the brace would not fit and he needed to crack her back. She refused because she had scoliosis. Defendant assured Ledbetter that he was a physician and stated a massage would help. He massaged her back and left breast. When she became nervous, defendant strapped the brace on over her clothing. Ledbetter quit later that day.

Defendant told Tomlinson, Ledbetter's replacement, to remove her clothing and that he was a doctor. Tomlinson removed all of her clothing in the bathroom, wrapping herself in a towel. At defendant's request, she opened the towel. Defendant placed the brace against her, marking beneath her breasts and at her hips. He told Tomlinson that she could drop the towel. Defendant adjusted the brace to her but told her that she had scoliosis, which he could temporarily correct by massaging her spine into alignment. As she was lying down on the couch, defendant massaged both sides of her torso. However, he did not touch her breasts.

Later that evening, defendant told Tomlinson that he had been reared in a very religious household and had studied scripture. How-

ever, he was having serious doubts as to the validity of his nondenominational beliefs. Because of these doubts, he was no longer practicing his faith. Tomlinson further testified that while sight-seeing, defendant told her that he had had several extramarital affairs. However, he believed his infidelity was harmless, as long as his wife did not find out. On the return trip, they viewed the Phoenix city lights from the mountain overlook. Tomlinson rebuffed defendant's attempt to kiss her. At the hotel, she refused defendant's offer of payment for modeling or the sight-seeing. Therefore, defendant hugged her and apologized. As she was leaving, defendant said, "Since you wouldn't let me up on the mountain, can I at least fantasize." She responded that he could do whatever he wanted after she had left.

Edward Roman, an orthotist, stated that ordinarily a CASH brace can be adjusted to a patient in two to three minutes and is the easiest brace to adjust. It is designed to be worn over a T-shirt and underwear but can be worn over outer garments. It is not necessary for a patient to be topless or nude to properly adjust the brace. Marking the torso is unnecessary.

Lawrence Macy testified that he has been a member of the Brethren for 46 years and has known defendant since defendant was a child. The Brethren believe a marriage may not be dissolved except in situations of adultery or abandonment. The nonoffending spouse may then seek a divorce. Adultery is sexual intercourse with a nonspouse. When one of the Brethren suspects that another is engaging in adultery, he goes to the brothers, who initiate an investigation. The investigatory group may consist of a panel of the brothers or all of the brothers in the assembly. Then, the case is presented to the entire assembly, which determines if the offender may remain in fellowship or must be set aside. A person who is set aside is excommunicated and may not socialize with members of the Brethren. In extreme cases, this applies to parents and extended family members. An adulterer may be reinstated if he shows sufficient contrition.

In response to a hypothetical question, Macy testified that attempting to hug or kiss a partially clad woman, under the circumstances presented in the instant case, might be grounds for a public rebuke, silencing, or excommunication and shunning. Rebuking or reprimanding a person means the assembly as a whole would tell the person the conduct is not in accord with religious concepts. Silencing only applies to brothers, since women do not lead services. A silenced brother may not select hymns, read from scripture, lead prayers, or teach on scripture.

Defendant testified in his own behalf. The portions of his testi-

mony which have been previously stated will not be recounted. Defendant was doing research to develop a universal brace and size chart. Close measurements were needed for this research. Nudity and detailed marking of the models were necessary for development of the universal brace. However, measurements were not needed to adjust the CASH orthosis. Defendant did not tell the models that he was using them for research and met them privately so that he would not have to explain his conduct. He acknowledged that he would need to do substantial additional research before developing a new brace.

Defendant essentially agreed with Segobiano's, Payne's, Harper's, Jarrett's, and Wilmoth's accounts of the fitting/modeling sessions. Although he agreed that he hugged Webb, he denied telling her that his wife could not find out and did not remember offering her a ride to Kentucky. He denied telling Ledbetter that he was a doctor or using the phrase "crack her back." Defendant's memory differed sharply from Tomlinson's memory. Defendant stated he asked her to be topless for the measurements. She surprised him by completely undressing and dropping the towel at his request. However, he did not tell her to dress. He denied telling Tomlinson or anyone else that he was a doctor; having any conversation about his marriage or religion; making any sexual overtures; attempting to kiss Tomlinson, and asking if he could fantasize about her. Defendant stated that Tomlinson, in fact, discussed her religious beliefs, saying she was having difficulties with her faith.

Defendant admitted being attracted to Webb and Wilmoth and agreed possibly he told Webb he was a good Christian. He pulled the draperies closed in Wilmoth's apartment because he thought drivers could see into the apartment. The massage was for his gratification, but Wilmoth, whom he remembered as topless, stopped him before he could complete a massage of her breast area.

Defendant further testified that he and his family participated in many activities, including trips. He and Susan were happily married, and he never contemplated divorce or separation. On November 7, Susan cleaned house. The last thing they discussed was adopting a child. He denied killing his family.

A number of character witnesses testified on defendant's behalf. All stated that defendant and his family had an excellent relationship, defendant never physically punished the children, and Susan and he had a loving relationship. All attested to defendant's exemplary reputation for truth and honesty. Witnesses testified that defendant lost weight for health purposes and received a coupon for free hair styling. Defendant stated that he lost weight on the advice of his doctor,

purchased new clothing from discount shops, styled his hair because he received a free coupon, never dyed his hair, and shaved his mustache as an anniversary surprise for Susan.

James Russ, director of orthotic education and defendant's former instructor, stated that he teaches students to palpate the torso to locate landmarks and to mark the landmarks on the patient's skin or clothing. Some orthotists make numerous marks on a patient for public-relations purposes. Detailed measurements are necessary to manufacture a brace. However, it is unethical to use a subject for research without informing the subject. Defendant attended ethics classes.

Petty agreed with Romyn's testimony as to the children's injuries and causes of their deaths. One of Susan's injuries could have been caused by an unknown knife. Susan also may have been manually strangled. Petty concluded that four weapons had been used to injure Susan: the ax, butcher knife, perpetrator's hands, and an unknown knife. Multiple weapons indicate multiple assailants. However, nothing about the wounds necessarily precluded a single assailant. Defects in Susan's nightgown and the bedspread supported Petty's opinion. Some defects were inconsistent with a butcher knife, or ax. Petty admitted that no wound corresponded to the 3/4-inch-long defect in Susan's nightgown. The defects in the bedspread were L-shaped and 3/8 inches long.

Irvin Stone, a forensic scientist, testified that a burglary had occurred at the scene. However, he admitted that some elements at the scene were inconsistent with a burglary. Therefore, he could not exclude the possibility that the burglary was a subterfuge crime. He concluded three instruments were used by the assailants, the two weapons found at the scene and a third knife-like weapon. He agreed with Petty that use of multiple weapons raised a possibility of multiple assailants.

Baden testified in rebuttal that Susan's injuries were consistent with the ax and knife found at the scene. The defects in her nightgown and bedspread could have been caused by the tip of the knife. He did not find any evidence consistent with a conclusion that she had been strangled. Given the condition of Susan's stomach contents and assuming she ate a snack consisting of vegetables, cheese, crackers, and cookies, she could have been dead between 1 and 1½ hours after eating.

Milton Schmitt, a board-certified gastroenterologist and internist, testified that he had done specialized research in digestion and had examined at least 4,000 persons using a gastroscope. Human digestion does not occur in layers. Exercise would not delay or retard di-

gestion or gastric emptying. Schmitt, who was familiar with the apparatus at Chuck E. Cheese, assumed vigorous play by children of the victims' ages for 40 to 45 minutes. The play would not delay digestion or consequent gastric emptying.

Officer Michael Scott testified that he made a test drive from defendant's home to Stevens Point, Wisconsin. He did not stop and observed all traffic signals. The trip took 5 hours and 45 minutes. At trial defendant stated that he left at 11 p.m. and arrived at 7 a.m., stopping for no more than 45 minutes. This would have given him 7 hours and 15 minutes of travel time, a net difference of 1 hour and 20 minutes. At the outset, we note that the totality of the facts leads to the inescapable conclusion that defendant committed the charged offenses.

Defendant argues that the evidence is not sufficient for a jury to find him guilty beyond a reasonable doubt. Therefore, his convictions must be reversed. As part of his reasonable-doubt argument, defendant maintains that at most expert testimony establishing presence was unreliable and subject to dispute, the evidence establishes mere presence at the scene, the proffered motive was insufficient to support a finding of guilt, a reasonable hypothesis of innocence existed, and the jury's verdict was the result of passion or prejudice caused by admission of motive evidence. Defendant then argues in essence that the trial court erred in denying his motions for directed verdict. We address defendant's reasonable-doubt contentions in order.

 █ Expert testimony establishing time of death was hotly contested. On appeal, defendant states that expert testimony established mere estimates of a probable time of the victims' deaths and a reasonable doubt is necessarily created in a circumstantial-evidence case where a key issue rests upon disputed opinion testimony. The credibility of expert testimony and the weight accorded to the testimony are questions for the trier of fact. (*People v. Gray* (1984), 121 Ill. App. 3d 867, 460 N.E.2d 354.) A mere conflict in expert testimony does not create a reasonable doubt of an accused's guilt. (*People v. Platter* (1980), 89 Ill. App. 3d 803, 412 N.E.2d 181; see generally *People v. Rosenberger* (1984), 125 Ill. App. 3d 749, 466 N.E.2d 608.) A jury's verdict will not be reversed unless the evidence is so unsatisfactory or improbable as to raise a reasonable doubt of the accused's guilt. (*People v. Williams* (1982), 93 Ill. 2d 309, 444 N.E.2d 136, *cert. denied* (1984), 467 U.S. 1218, 81 L. Ed. 2d 371, 104 S. Ct. 2666.) The fact that the expert testimony conflicted in the instant case does not create a reasonable doubt of defendant's guilt.

 The determination of whether a witness is qualified to testify

as an expert is within the trial judge's discretion. (*People v. Williams* (1984), 128 Ill. App. 3d 384, 470 N.E.2d 1140 (expert qualified by experience in forensic odontology).) His decision will not be overturned on appeal unless it is clearly erroneous. (*People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528.) An individual will be permitted to testify as an expert when experience and qualifications give him knowledge not common to the world and his testimony will aid the jury in reaching its determination. *People v. Beil* (1979), 76 Ill. App. 3d 924, 929, 395 N.E.2d 400, 403.

Here, all of the experts who testified were qualified by their experience, education, and developed expertise in botany, physiology, forensic pathology, and forensic science. Expert testimony was of assistance and necessary to determine when the victims' deaths occurred. The trial judge did not abuse his discretion in finding the experts were qualified to render opinion testimony and in finding such testimony would be of assistance to the trier of fact. *People v. Williams* (1984), 128 Ill. App. 3d 384, 470 N.E.2d 1140; *People v. Wade* (1977), 51 Ill. App. 3d 721, 366 N.E.2d 528.

■ Initially, the proponent of expert testimony must demonstrate the reliability of the proffered scientific evidence. (*People v. Milone* (1976), 43 Ill. App. 3d 385, 356 N.E.2d 1350.) A scientific opinion must be based upon principles or techniques which have gained general acceptance in the scientific community. (*People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569; *People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070.) However, general scientific acceptance is not a prerequisite if the evidence is otherwise shown to be reliable. (*People v. Jennings* (1911), 252 Ill. 534, 96 N.E. 1077; *People v. Columbo* (1983), 118 Ill. App. 3d 882, 957-60, 455 N.E.2d 733, 788-90, *cert. denied* (1984), 467 U.S. 1208, 81 L. Ed. 2d 351, 104 S. Ct. 2394; *People v. Milone* (1976), 43 Ill. App. 3d 385, 356 N.E.2d 1350.) A trial court's ruling on the admissibility of expert testimony will be reversed only upon an abuse of discretion. *People v. Park* (1978), 72 Ill. 2d 203, 380 N.E.2d 795.

■ A dispute in the scientific community about the reliability of a method goes to the weight of the evidence. (*People v. Columbo* (1983), 118 Ill. App. 3d 882, 455 N.E.2d 733; *People v. Milone* (1976), 43 Ill. App. 3d 385, 356 N.E.2d 1350.) It does not necessarily mean the testimony fails to satisfy the basic requirements of scientific acceptance or reliability. The court may consider that all experts agree that the basic theory exists in the scientific community. (*People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569.) Courts may also consider the nature of the evidence being offered.

All of the experts here agreed that gastric analysis may not be used to state a precise time of death or to state a narrow range of time during which death occurred. The experts agreed that there was a dispute in the scientific community as to how useful gastric analysis is in determining a time of death. However, the State's experts, Davis and Baden, did not state a precise time of death, but they posited a range of time during which death occurred. The defendant's experts stated the range was too narrow and variables precluded correlating digestion and gastric emptying with a specific time frame. Baden and Davis stated that, in the instant case, the average range applied because variables, which ordinarily might retard digestion, could be eliminated. Similarities in the children's samples reduced the possibility of individual digestive quirks. Defendant's experts admitted that the only variables which might apply were exercise and unknown. Defendant's experts' opinions about exercise as a delaying factor were impeached and contradicted by the State's experts.

Defendant's experts agreed that fragments present in the children's gastric samples were well-preserved. Rose admitted that the volume of the gastric samples and condition of the vegetable matter was consistent with a shorter post-ingestion interval prior to death. Jaffe admitted that the condition of the vegetable matter in the gastric samples could indicate the material was in the early stages of digestion. Petty admitted that his opinion was based primarily upon information received about volume eaten. If this information was incorrect, his opinion could change.

■ Here, as in *Jordan*, all of the experts agreed that the basic theories existed in the scientific community. Opinions offered were not stated in terms of mathematical precision. No error occurred in admitting expert testimony on time of death. (*People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569; *People v. Columbo* (1983), 118 Ill. App. 3d 882, 455 N.E.2d 733; *People v. Milone* (1976), 43 Ill. App. 3d 385, 356 N.E.2d 1350.) We note that expert testimony establishing a probable time of death from analysis of stomach contents has been admitted in criminal cases in Illinois. See *People v. Crow* (1985), 108 Ill. 2d 520, 524, 485 N.E.2d 381, 383; *People v. Milone* (1976), 43 Ill. App. 3d 385, 356 N.E.2d 1350; *People v. Richards* (1970), 120 Ill. App. 2d 313, 256 N.E.2d 475.

■ Defendant next argues that, conceding the expert testimony establishing a probable time of death, all of the State's evidence established his mere presence at the scene of the offense and opportunity to commit the murders. Defendant argues, relying upon four cases, that mere presence at the scene of an offense is insufficient to

support a conviction. We note that presence and opportunity, in the instant case, are highly probative of guilt. The jury chose to draw inferences from the evidence, which reflected upon more than defendant's mere presence in the house when the offenses occurred. Without recapitulating the evidence, we note that determining which inferences to draw from contradictory evidence is inherently the function of the trier of fact.

The cases which defendant relies upon are distinguishable from the instant case. In *People v. Howard* (1979), 74 Ill. App. 3d 870, 393 N.E.2d 1084, a mother was convicted of murdering her 4-year-old son, who was found stabbed on the couch in the family room. Howard's alibi was unimpeached. Several witnesses testified that she had been receiving threats. Two witnesses saw someone walking away from the house at about the time of the victim's death. A note, found on the victim's body, indicated the child had been killed by Howard's enemy. In reversing the conviction, the appellate court noted that the prosecution had failed to introduce substantial evidence which, either directly or indirectly, linked Howard to the offense or indicated that the evidence about an intruder had been fabricated. The court also noted that the absence of a motive for the offense was important in its decision. 74 Ill. App. 3d 870, 877, 393 N.E.2d 1084, 1088-89.

■ In the instant case, the State offered a motive for the offense. There were also inconsistencies in defendant's testimony. The evidence indicated that the offenses were preplanned and carefully executed. The weapons were weapons of choice. The State also presented evidence, through defendant's statements, that showed defendant alone committed the offenses. He could not have kissed the victims goodbye before he left and not noticed they were dead. Substantial indirect evidence connected defendant with the offenses.

In *People v. Holtz* (1920), 294 Ill. 143, 128 N.E. 341, defendant was convicted of killing her husband. On appeal, the court reversed, after noting that much of the motive evidence was inadmissible. Evidence supported the claim that an intruder, burglarizing their house, killed the victim. (*People v. Holtz* (1920), 294 Ill. 143, 128 N.E. 341.) Defendant's reliance upon *People v. Lewellen* (1969), 43 Ill. 2d 74, 250 N.E.2d 651, and *People v. Tillman* (1971), 130 Ill. App. 2d 743, 265 N.E.2d 904, is misplaced. Neither case is analogous to the instant situation.

In the instant situation, much of the detailed evidence went simply toward establishing that the offense had occurred. No specific physical evidence linked defendant to the death. *Holtz* and *Howard* are similar in this respect. However, whether all of the evidence, if

viewed in a manner unfavorable to the defendant, merely goes to his presence, is a matter of what inferences are drawn from the evidence. Determining which inferences to draw from the evidence is a jury function. (*People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569.) Additionally, opportunity linked with other incriminating evidence may be sufficient to support a guilty verdict. (*People v. Armstrong* (1983), 111 Ill. App. 3d 471, 444 N.E.2d 276.) The evidence in the instant case could be viewed as showing opportunity, presence, motive, and attempt to disguise the crime scene and establish an alibi. Additionally, the credibility of defendant's statements that the victims were alive when he left is questionable. The jury could also view defendant's statements to the media as indicating knowledge of the scene which would have been unavailable to him or to the general public at the time the statements were made.

Defendant next argues both as a part of his reasonable-doubt argument and as a separate issue that the motive theory postulated by the State was not probative of murder. Therefore, all the State established was his possible presence at the scene of the offense, and the evidence was not sufficient to sustain the conviction. We believe the proffered motive theory was probative of murder in the instant case. It will be discussed in more detail in conjunction with the admissibility question.

■ Defendant next argues that a reasonable hypothesis of innocence exists under the instant facts and the jury's verdict was based upon prejudice over impartiality. A conviction may be based solely upon circumstantial evidence. (*People v. Albanese* (1984), 102 Ill. 2d 54, 76, 464 N.E.2d 206, 217-18.) In such a case the facts proved taken as a whole must be consistent with the accused's guilt and inconsistent with any reasonable hypothesis of innocence. (*People v. Branion* (1970), 47 Ill. 2d 70, 265 N.E.2d 1, *cert. denied* (1971), 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2213; *People v. Magnafichi* (1956), 9 Ill. 2d 169, 137 N.E.2d 256; *People v. Howard* (1979), 74 Ill. App. 3d 870, 393 N.E.2d 1084.) If under the evidence two equally reasonable hypotheses exist, the one consistent with innocence should be accepted. (*People v. Drake* (1985), 131 Ill. App. 3d 466, 475 N.E.2d 1018.) However, the jury may assess defendant's credibility (*People v. Jones* (1985), 105 Ill. 2d 342, 475 N.E.2d 832; *People v. Bush* (1981), 103 Ill. App. 3d 5, 430 N.E.2d 514) and assess the reasonableness of the hypothesis of innocence (*People v. Williams* (1984), 128 Ill. App. 3d 384, 470 N.E.2d 1140).

■ The evidence, as adduced, need not exclude all imaginable situations wherein defendant might possibly be innocent. (*People v.*

*Hargis* (1983), 118 Ill. App. 3d 1064, 456 N.E.2d 250, *rev'd on other grounds* (1984), 102 Ill. 2d 533, 468 N.E.2d 969.) Where the circumstantial evidence relied upon to support the defense that another committed the crime is unsatisfactory, based upon mere surmise or possibility, without evidence to support it, a hypothesis of innocence may be rejected by the trier of fact. (*People v. Williams* (1985), 131 Ill. App. 3d 597, 604, 475 N.E.2d 1082, 1087; *People v. Despain* (1981), 102 Ill. App. 3d 1063, 1067, 430 N.E.2d 228, 289.) We believe the evidence as a whole supported the jury's verdict. (*People v. Hobson* (1983), 117 Ill. App. 3d 191, 452 N.E.2d 771.) The jury's verdict was not based on passion or prejudice caused by the motive evidence.

Defendant next argues that his conviction was based upon speculation and conjecture as evidenced by the trial judge's statements at the sentencing hearing. Defendant maintains these statements reveal that the trial judge erred in denying his motions for directed verdict. The State responds that the judge's comments were an explanation of his reasons for not imposing the death penalty. The comments were not a statement on the sufficiency of the evidence. We agree.

During the sentencing hearing, after reviewing aggravating and mitigating factors, the trial judge noted that the jurors were convinced beyond a reasonable doubt of defendant's guilt and that he felt the evidence was legally sufficient to reach the jury for its consideration, though a key issue depended upon the relative credibility of disputed expert testimony. The judge stated that he intended no criticism of the jury or its verdict. However, he could not sentence defendant to death unless he was personally convinced of defendant's guilt beyond a reasonable doubt.

A motion for directed verdict asserts as a matter of law that the evidence, considered most strongly in favor of the State, is insufficient to support a finding or verdict of guilty. The trial court, in ruling on the motion, considers only whether a reasonable jury could fairly conclude that the guilt of the accused has been proved beyond a reasonable doubt. (*People v. Withers* (1981), 87 Ill. 2d 224, 429 N.E.2d 853; *People v. Tatum* (1966), 77 Ill. App. 2d 178, 222 N.E.2d 177; Ill. Rev. Stat. 1983, ch. 38, par. 115—4(k).) If reasonable minds could differ or if evidence supports the opposing party, the motion should be denied. (*People v. Watson* (1982), 103 Ill. App. 3d 992, 999, 431 N.E.2d 1350, 1356.) Resolution of conflicting evidence and assessing witness credibility is a jury function. A verdict in favor of an accused does not necessarily mean the State presented insufficient evidence to sustain a conviction, but may mean that, after viewing conflicting evidence, the jury adopted a view favorable to the accused. *People v.*

*Post* (1966), 78 Ill. App. 2d 121, 223 N.E.2d 238, *rev'd on other grounds* (1968), 39 Ill. 2d 101, 233 N.E.2d 565.

 Defendant principally argues that the trial court's statements were an admission that the evidence was insufficient to sustain the verdict. This argument has little merit. A trial judge's sentencing statements must be considered in context and read in their entirety. (*People v. Young* (1985), 138 Ill. App. 3d 130, 142, 485 N.E.2d 443, 450; *People v. Buss* (1983), 112 Ill. App. 3d 311, 318, 445 N.E.2d 894, 899.) Here, the judge specifically stated that he found the evidence legally sufficient to reach the jury. He denied defendant's motions for directed verdict at the close of the State's case and at the close of all the evidence. In context, the trial court said that as a trier of fact, he would have decided the credibility issues differently. The fact that the trial court, as 13th juror, would have decided the issues differently does not mean a reasonable jury could not have concluded that defendant's guilt had been proved beyond a reasonable doubt. See generally *People v. Easter* (1981), 102 Ill. App. 3d 974, 981-82, 430 N.E.2d 612, 618; *People v. Buss* (1983), 112 Ill. App. 3d 311, 445 N.E.2d 894; *Asher v. Stromberg* (1966), 78 Ill. App. 2d 267, 275-76, 223 N.E.2d 300, 304-05 (appellate court in medical malpractice action held that the trial judge's denial of plaintiff's motion for a new trial in spite of his statements that he would have judged expert testimony differently was not error).

Defendant next argues, in essence, that his conduct with the models was not logically probative of the State's motive theory and did not serve to identify him as the perpetrator of the offenses. Therefore, the State impermissibly put his character on trial, and the trial court erred in admitting the prior acts evidence. Defendant suggests that motive evidence may be used to explain an accused's conduct only when solid proof exists that the accused committed the offenses charged. Therefore, defendant suggests a stricter relevancy test should be employed in a circumstantial-evidence case.

The State responds that the models' testimony was properly admitted as tending to establish an explanation for the commission of the offenses by reflecting upon defendant's changed life-style.

██ Evidence of extra-indictment offenses is not admissible to show an accused's propensity to commit the charged offense. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.) However, evidence of other acts is admissible when relevant to *modus operandi*, knowledge, intent, motive, plan, identification, or absence of mistake or any other issue in the cause. (*People v. Jones* (1985), 105 Ill. 2d 342, 475 N.E.2d 832; *People v. Adams* (1985), 109 Ill. 2d 102, 121-22,

485 N.E.2d 339, 345-46; *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) Evidence of other crimes or prior acts is admissible to show motive. (*People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840; *People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6; *People v. Dewey* (1969), 42 Ill. 2d 148, 246 N.E.2d 232.) Generally, any evidence which tends to show that an accused had a motive for killing the deceased is relevant. To be competent, the evidence must at least to a slight degree tend to establish the motive relied on. *People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840; *People v. Branion* (1970), 47 Ill. 2d 70, 77, 265 N.E.2d 1, 5, *cert. denied* (1971), 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2213; *People v. Gougas* (1951), 410 Ill. 235, 238-39, 102 N.E.2d 152, 154; *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734.

■ Motive evidence, by its nature, provides a reason for the commission of the offense and tends to identify a particular accused as the perpetrator. (See generally *People v. Manzella* (1973), 56 Ill. 2d 187, 198-99, 306 N.E.2d 16, 22, *cert. denied* (1974), 417 U.S. 933, 41 L. Ed. 2d 236, 94 S. Ct. 2644 (discussing whether giving an instruction defining motive was error); *People v. Gougas* (1951), 410 Ill. 235, 102 N.E.2d 152; *People v. Strause* (1919), 290 Ill. 259, 290-91, 125 N.E. 339, 350; *People v. Enright* (1912), 256 Ill. 221, 234, 99 N.E. 936, 941; Black's Law Dictionary 914 (5th ed. 1979).) Whether the proffered motive would provide a reason for the offense is determined by reason and logic. (See generally *People v. Merritt* (1978), 64 Ill. App. 3d 482, 488, 381 N.E.2d 407, 412.) The jury may infer that the proffered motive was the reason for the offense. Direct testimony to this effect is not necessary. (*People v. Wallace* (1983), 114 Ill. App. 3d 242, 249, 448 N.E.2d 910, 916.) Motive evidence is not inadmissible merely because it may prejudice an accused. *People v. Grice* (1978), 60 Ill. App. 3d 7, 376 N.E.2d 283.

■ The State is not required to prove an accused had a motive for the offense. However, the presence or absence of a motive is an important and probative factor in a circumstantial evidence case. (*People v. Weaver* (1982), 92 Ill. 2d 545, 442 N.E.2d 255; *People v. Howard* (1979), 74 Ill. App. 3d 870, 393 N.E.2d 1084; *People v. Richards* (1970), 120 Ill. App. 2d 313, 256 N.E.2d 475.) Introduction of irrelevant motive evidence may prejudice the accused. In a circumstantial-evidence case, reasonable hypotheses of innocence are likely to be discounted as evidence of possible motives compound. *People v. Harbold* (1984), 124 Ill. App. 3d 363, 377, 464 N.E.2d 734, 745; *People v. Weaver* (1980), 90 Ill. App. 3d 299, 303, 412 N.E.2d 1353, 1357-58, *aff'd* (1982), 92 Ill. 2d 545, 442 N.E.2d 255.

■■■ Since motive evidence, by definition, provides a possible reason for the commission of an offense, it necessarily tends to identify a particular accused as the perpetrator of the offense. Prior-acts evidence may be admitted to establish a motive theory if it is relevant to the theory. It is relevant if it tends to establish the theory relied upon. (*People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840.) Defendant argues the models' testimony was irrelevant because it itself did not establish the entire motive theory for the commission of the offenses. Therefore, defendant asserts the trial court erred in admitting the evidence. Since the relevance of the particular item of evidence depends upon whether it advances the entire motive theory (105 Ill. 2d 22, 473 N.E.2d 840), arguing that defendant's acts in and of themselves do not provide a reason for the offense does not address the question of whether the evidentiary item is relevant to the proffered motive and therefore admissible.

■■■ Here, the motive was very broad. The State proposed that a conflict developed between defendant's changed life-style, shown by his increasingly aggressive conduct with the models and changed appearance and his religious tenets on marriage, extramarital meretricious conduct, and divorce. Resolution of the conflict led defendant to kill his family. Testimony from the models established that defendant's conduct became increasingly less professional over a period of time. Defendant admitted that he was sexually attracted to two of the models. The testimony advanced the proffered theory by establishing that a change in behavior did occur and establishing the increasingly aggressive and sexual nature of the defendant's conduct. Therefore, the evidence meets the admissibility test stated under *Stewart*, although the models' testimony would not establish the entire motive theory. The testimony of Tomlinson, Wilmoth, and Webb indicated that defendant was aware that his actions conflicted with his religious beliefs, did not want his wife to find out, and the conflict existed between defendant's beliefs and his actions.

The change in defendant's appearance could be seen as an indication of the change in his life-style and caused by his desire for increased contact with the models. Defendant's appearance and outgoing character were contrasted with Susan's less stylish appearance and retiring character. All of the above logically advanced the theory of a conflict which developed between defendant's conduct and his religious beliefs and actual life-style. His church's reaction to illicit relationships would be relevant to his desire and need to keep the conduct secret. Defendant's business success was a factor which enabled him to expand his contacts with young women, travel out-of-State, and ex-

pand his contacts with persons ascribing to less stringent moral standards. Evidence of his business success would, therefore, tend to advance the motive theory.

■■ Defendant maintains that extramarital involvement must reach the level of sexual intercourse to be a motive for murder. We disagree. Evidence of extramarital relationships need not reach the level of sexual intercourse before the evidence is admissible as part of a motive theory. (*People v. Weaver* (1982), 92 Ill. 2d 545, 442 N.E.2d 255; *People v. Branion* (1970), 47 Ill. 2d 70, 265 N.E.2d 1.) No error occurred in admitting the models' testimony and other motive evidence. *People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840.

Defendant next argues that the prejudicial effect of the models' testimony and detailed financial-status testimony outweighed its probative value. Therefore, defendant maintains the evidence was not legally relevant, and the trial court erred in admitting it. He argues that the State's closing arguments exacerbated the error. The State responds that the detailed testimony by the models was necessary to show an increased pattern of aggression and that defendant's conduct was not so outrageous that the jury would convict him based upon passion or prejudice.

■ Evidence of prior acts or of other offenses is admissible if relevant to any issue in the cause other than propensity to commit the offense. (*People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) The probative value of the evidence however, must outweigh its prejudicial impact on the jury. (*People v. Rodriguez* (1982), 107 Ill. App. 3d 43, 50, 437 N.E.2d 441, 446.) This determination rests within the discretion of the trial court. (*People v. Harris* (1980), 91 Ill. App. 3d 112, 414 N.E.2d 755; *People v. Johnson* (1980), 81 Ill. App. 3d 359, 401 N.E.2d 288; *People v. Dumas* (1977), 49 Ill. App. 3d 756, 364 N.E.2d 616.) Admission of unnecessary detail about the uncharged offenses may constitute an abuse of discretion and reversible error. *People v. Harris* (1980), 91 Ill. App. 3d 112, 414 N.E.2d 755; *People v. Rodriguez* (1982), 107 Ill. App. 3d 43, 437 N.E.2d 441; *People v. Diaz* (1979), 78 Ill. App. 3d 277, 397 N.E.2d 148.

■■ Defendant relies upon *People v. Funches* (1978), 59 Ill. App. 3d 71, 375 N.E.2d 135, where the court noted that allowing "prosecutorial overkill" may also constitute an abuse of discretion. In *Funches*, the State introduced the testimony of several persons whose vehicles had been stolen in Chicago and four persons who had purchased the same vehicles from defendant. The court noted that some of the evidence was admissible. However, too much of it was introduced. Therefore, the prejudicial effect outweighed its probative value. However, if

the detailed testimony is necessary to establish motive, no error occurs in its admission. *People v. Durso* (1968), 40 Ill. 2d 242, 239 N.E.2d 842, *cert. denied* (1969), 393 U.S. 1111, 21 L. Ed. 2d 807, 89 S. Ct. 923.

Here, a part of the State's motive theory was that defendant's pattern of behavior with the models changed dramatically as his business became successful. The models' accounts of the fitting sessions reflected the increasing pattern and apparent increasing aggressiveness on defendant's part. The detailed testimony of the models was necessary to show the pattern of behavior. The trial court did not abuse its discretion in finding the probative value of the evidence outweighed its prejudicial effect.

 Defendant suggests that the abuse-of-discretion standard should not be applied in determining whether the trial court erred in admitting the models' testimony, because the prosecution misled the trial court and never fully set forth the theory. He then argues the State did not connect up the motive theory to its motive evidence. Defendant misconstrues the trial record. His argument is without merit.

Defendant argues the trial court erred in denying his motions to sequester the jury and that this denied him due process. Defendant asserts that the jury could have been biased by media coverage during trial and the airing of a television mini-series. Defendant concedes that the trial court diligently admonished the jury and followed established precedent but argues that this was not enough because of the circumstantial nature of the case. On March 2, 1984, defendant filed a motion for change of venue and to sequester the jury. The trial court granted the motion for change of venue. Defendant renewed his motion to sequester the jury on September 24, 1984, the day jury selection started. The court denied the motion but stated it would reconsider a renewed motion during trial or if the prospective jurors had been exposed to media accounts of the proceedings. The jurors had not been exposed to media accounts prior to selection.

Initially, the trial judge admonished the jurors and prospective jurors on a daily basis about exposure to the media or any other discussion of the case. On October 24, 1984, defendant renewed his motion to sequester the jury based upon a newspaper article. The trial judge, after reading the article, noted that it was inaccurate and could be prejudicial. Each juror denied reading or hearing about the article. The court admonished the jury to avoid media accounts of the case, then denied defendant's motion.

The next day defendant renewed the motion to sequester the jury

based upon potential prejudice of a follow-up article. The judge told the jury that he had devised a plan to eliminate the need for daily inquiry about exposure to news accounts of the trial. Each juror was required to sign a sworn affidavit, which stated his or her freedom from exposure to media accounts. The jurors stated that they had not seen or heard any discussion of the current article, and the trial court denied the renewed motion.

The State filed a motion to supplement the appellate record with the affidavits, which were not filed in the trial court. The record reveals that the trial court and the attorneys noted that the affidavits had been signed and discussed them during argument on the post-trial motion. At oral argument defendant stated that he did not object to the motion. We, therefore, allow the motion to supplement the record. 87 Ill. 2d R. 329; *People v. Jones* (1981), 102 Ill. App. 3d 238, 429 N.E.2d 1094; *People v. Carroll* (1977), 49 Ill. App. 3d 387, 364 N.E.2d 408.

On November 2, 1984, defense counsel requested the court admonish the jury to avoid promotional materials for a television miniseries. The court agreed and did so. The court repeated its admonishments about the program on November 6 and November 9, 1984. The judge then gave the jury the option of hearing evidence while the program aired or being sequestered. The jury opted for special evening trial sessions, which were held.

█ The determination of whether the jury should be sequestered is within the trial court's discretion. (*People v. Yonder* (1969), 44 Ill. 2d 376, 256 N.E.2d 321, *cert. denied* (1970), 397 U.S. 975, 25 L. Ed. 2d 270, 90 S. Ct. 1094.) The issue is not whether the trial court correctly refused to sequester the jury, but whether the record demonstrates the accused received a fair trial. (*People v. Harper* (1970), 127 Ill. App. 2d 420, 262 N.E.2d 298, *cert. denied* (1972), 404 U.S. 1062, 30 L. Ed. 2d 751, 92 S. Ct. 743; *People v. Vaughn* (1975), 25 Ill. App. 3d 1016, 324 N.E.2d 17.) If a jury is adequately admonished and there is no demonstration of actual prejudice by the defendant, a refusal to sequester the jury is not reversible error. *People v. Yonder* (1969), 44 Ill. 2d 376, 256 N.E.2d 321; *People v. Vaughn* (1975), 25 Ill. App. 3d 1016, 324 N.E.2d 17.

█ In *People v. Endress* (1972), 5 Ill. App. 3d 821, 284 N.E.2d 725, the defendant argued that because of the possibility of prejudice caused by media accounts, the denial of his sequestration motions was error. The appellate court rejected this argument, noting the defendant had not demonstrated the existence of any prejudice and had received a fair trial. Defendant's argument in the instant case is also

based upon the possibility of prejudice. The record indicates that the jury was admonished carefully about avoiding media exposure and all exposure to the television mini-series. Defendant does not argue and has not shown any actual prejudice or media influence. The record indicates that the jurors were not exposed to media accounts or to the mini-series. We believe defendant received a trial by a jury uninfluenced by media accounts. No reversible error occurred. *People v. Yonder* (1969), 44 Ill. 2d 376, 256 N.E.2d 321.

■■■ Defendant next argues that the foundation of admission of computer-generated records was not met and that the trial court erred in taking judicial notice that the IBM/PC is a standard business machine. Therefore, his business records should not have been admitted into evidence. Additionally, he argues that no evidence exists that the software package was reliable. Computer-generated records may be admitted into evidence under the business-records exception to the hearsay rule if a proper foundation has been established. (*People v. Bovio* (1983), 118 Ill. App. 3d 836, 455 N.E.2d 829; *People v. Mormon* (1981), 97 Ill. App. 3d 556, 557, 422 N.E.2d 1065, 1072, *aff'd* (1982), 92 Ill. 2d 268, 442 N.E.2d 250; *People v. Boyd* (1978), 66 Ill. App. 3d 582, 384 N.E.2d 414.) In order to establish a foundation the State must show that: (1) the computing equipment is standard; (2) the entries are made in the regular course of business at or near the time of the happening of the event recorded; and (3) the sources of the information and the method and time of preparation are such as to indicate trustworthiness and justify admission. *People v. Bovio* (1983), 118 Ill. App. 3d 836, 455 N.E.2d 829; *People v. Mormon* (1981), 97 Ill. App. 3d 556, 422 N.E.2d 1065; *People v. Boyd* (1978), 66 Ill. App. 3d 582, 384 N.E.2d 414; *Grand Liquor Co. v. Department of Revenue* (1977), 67 Ill. 2d 195, 367 N.E.2d 1238; see also North, Computer Evidence in Illinois, 71 Ill. B.J. 590-93 (1983).

■■■ In *Grand Liquor*, the court noted the potential software and data-entry problems. (*Department of Revenue* (1977), 67 Ill. 2d 195, 199, 367 N.E.2d 1238, 1240; *People v. Mormon* (1981), 97 Ill. App. 3d 556, 422 N.E.2d 1065; see also Tapper, Evidence from Computers, 8 Ga. L. Rev. 562, 566-67.) The third foundation requirement solves the software problem. The fact that the hard-copy records are consistent with the computer records is also an indication of the trustworthiness of the computer-generated records. (See *People v. Mormon* (1981), 97 Ill. App. 3d 556, 422 N.E.2d 1065; *People v. Boyd* (1978), 66 Ill. App. 3d 582, 384 N.E.2d 414; *People v. Gauer* (1972), 7 Ill. App. 3d 512, 288 N.E.2d 24.) In *People v. Holowko* (1985), 109 Ill. 2d 187, 192, 486 N.E.2d 877, 879, the court held that printouts of the computerized

telephone tracing equipment were not hearsay. The court stated:

> "There can be no question that computer science has created many devices, the reliability of which can scarcely be questioned. We should therefore apply the rule that its accuracy and reliability is judicially noticeable, requiring only proof of the accuracy and proper operation of the particular device under consideration."

The trial court did not err in taking judicial notice that the IBM/PC is a standard, reliable computer.

██ The record also establishes that Crutcher made the entries in a regular course of business, on a daily and monthly basis. The information was reliable. The reports generated by the computer matched parallel manual records that she kept. Defendant's argument about the software is not well-taken. If the manual records and the computer-generated records were the same, the software package or program necessary to instruct the computer necessarily must have been functioning accurately. Therefore, the trial court did not err in finding the foundation for admission of the records was sufficient.

██ Defendant next argues, that because the proffered motive was complex and required many witnesses to develop, the trial court erred in failing to order pretrial disclosure of the State's motive theory and how it would be developed at trial. The State responds that Supreme Court Rule 412 does not require disclosure of trial strategy or explanations of how testimony is going to be used. (87 Ill. 2d R. 412.) We agree. Initially, we note that defendant, in his motions *in limine*, challenged each witness through which the State developed its motive theory. Extensive argument occurred on why the testimony would or would not be relevant. Supreme Court Rule 412 requires the State to provide: the names and addresses of witnesses, together with copies of their statements; any statements defendant made, together with a list of people to whom the statements were made; any grand-jury transcripts; all expert reports; the criminal records of witnesses; and books, photographs or tangible documents which the prosecutor expects to use. Pretrial discovery here spanned nine volumes of the common law record. It included all of the statements gathered from witnesses used at trial and many other items.

Defendant does not argue that the State failed to comply with Supreme Court Rule 412. He argues, in essence, that because of the volume of discovery involved and the nature of the motive theory, the trial court should have required the State to explain its trial theory and how the witnesses fit into the theory. Work product and trial theory are not discoverable. (87 Ill. 2d R. 412(j)(i).) The State is not re-

quired to explain the information provided in discovery or to point out its significance. (*People v. Hummel* (1976), 38 Ill. App. 3d 233, 347 N.E.2d 305; *People v. Anthony* (1976), 38 Ill. App. 3d 190, 347 N.E.2d 179.) No error occurred.

Defendant next argues, citing *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, that, because of his lack of sleep and the shock of discovering that his family was dead, he should not be expected to have had control of himself on November 8 or 9, 1983. Therefore, he was incapable of voluntarily, knowingly, or intelligently waiving his rights to counsel and to silence. The State responds that defendant knowingly and voluntarily waived his rights and the trial court correctly denied defendant's motion to suppress his statements. Defendant urges that this court hold as a matter of law that statements made under the instant circumstances are involuntary.

Defendant was questioned both at the Cramer's house and at the police station. The police did not read *Miranda* warnings to defendant before questioning him at the Cramer's. After defendant came to the station but before questioning, the police read *Miranda* warnings to him. Defendant questioned the police, then signed the waiver form. Both statements were introduced, through Crowe's testimony, at trial. On March 2, 1984, defendant filed a motion to suppress all of his statements, inculpatory and exculpatory, made on November 8, 1983, and November 9, 1983. On April 12, 1984, a hearing on the motion was held before Judge Knecht. The substance of defendant's statements has been previously summarized and will not be repeated here. Further information is added as necessary to a determination of whether the trial court erred in denying defendant's motions to suppress.

The police officers testified that defendant was calm and responsive at the Cramer residence. He was not shaking or emotionally upset. Before talking to him, the police did not suspect or have any reason to believe that defendant was implicated in the offense. Initially, Crowe asked investigatory questions. At the conclusion of the interview, defendant agreed to accompany the police to the police station. At 2:35 a.m., O'Brien read *Miranda* warnings to defendant, who waived them. Defendant asked why it was necessary to advise him. O'Brien stated it was to protect the investigation and defendant.

Karen and John Cramer testified that defendant was emotionally upset and in shock before officers arrived at their house. However, he walked upstairs with the police without assistance. Seth Palmer testified that defendant was crying but stated that defendant said he

wanted to help the police. Defendant understood questions. Nathan Palmer and Gerald Buchanan testified that defendant was distressed when he learned of his family's death. Nathan testified that later, at the police station, defendant said he was alright. However, he looked drawn and tired. Defendant did not testify at the suppression hearing.

The trial court found that defendant was not in custody at the Cramer's house and the investigation had not focused on him. The police had no objective reason to believe that defendant was involved. Therefore, *Miranda* warnings were not then necessary. The trial court further found that defendant voluntarily, knowingly, and intelligently waived his rights before speaking to the police at the station.

Defendant's lack of sleep was not raised as an issue or a contributing factor at the suppression hearing, which focused on defendant's emotional response to the news of his family's death and at what point the police focused their investigation upon defendant. The motion to suppress did not specify lack of sleep as a reason the waiver was involuntary. It, too, focused on defendant's response to the news of his family's death. However, it did state that because of defendant's physical condition he was incapable of voluntarily waiving his rights.

Defendant is, therefore, requesting this court to find the trial court's decision was against the manifest weight of the evidence based in part upon a factor which was not presented to the trial court. Failing to move for suppression on a specific ground at trial waives consideration of the ground on appeal. (*People v. Sanford* (1983), 116 Ill. App. 3d 834, 452 N.E.2d 710; *People v. Sanderlin* (1982), 105 Ill. App. 3d 811, 815, 434 N.E.2d 1158, 1161.) This court need not consider defendant's lack of sleep as a factor reflecting on the voluntariness of his statements.

On a motion to suppress defendant's statements, the prosecution must demonstrate by a preponderance of the evidence that the statements were voluntary. (*People v. Jackson* (1968), 41 Ill. 2d 102, 242 N.E.2d 160; *People v. Williams* (1984), 128 Ill. App. 3d 384, 470 N.E.2d 1140; Ill. Rev. Stat. 1983, ch. 38, par. 114—11.) A statement is not voluntary if defendant's will has been overborne at the time of the statement. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508, *cert. denied* (1982), 455 U.S. 1024, 72 L. Ed. 2d 144, 102 S. Ct. 1726.) The determination that an accused's will has been overborne is based upon the totality of the circumstances under which the statement was made. (*People v. Williams* (1984), 128 Ill. App. 3d 384, 470 N.E.2d 1140; *People v. Rathgeb* (1983), 113 Ill. App. 3d 943, 447 N.E.2d 1351.) The inculpatory or exculpatory nature of the state-

ments is also a factor which may be considered. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508.) A trial court's determination that a statement is voluntary may not be disturbed unless it is contrary to the manifest weight of the evidence. *People v. Britz* (1984), 128 Ill. App. 3d 29, 470 N.E.2d 1059, *aff'd* (1986), 112 Ill. 2d 314.

 On appeal, defendant does not clearly delineate whether he is contesting the statements made at the Cramers or at the station. The fifth amendment requires an accused be advised of his rights before custodial interrogation. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) A determination of whether an interrogation is custodial focuses upon the objective surroundings and what a reasonable man, innocent of any crime, would perceive. Several factors should be considered including: (1) the place of the interrogation; (2) statements or nonverbal conduct indicating that the accused is not free to leave; (3) the extent of law enforcement officers' knowledge and the focus of their investigation; and (4) the intentions of the officers. (*People v. Berry* (1984), 123 Ill. App. 3d 1042, 463 N.E.2d 1044.) Considering these factors, the trial court's decision that defendant was not in custody or subject to custodial interrogation while at the Cramers was supported by the evidence.

Defendant was at a friend's house, at their invitation. The officers did not have any objective reason to suspect defendant, who agreed to answer questions and help if he could. Initially, they asked investigatory questions. When they began to suspect defendant, they requested he come to the station, where he was advised of his rights. Although the witnesses disagreed as to defendant's emotional state, all agreed that he could answer questions. No error occurred in the trial court's determination that the first interview was admissible.

 Although this court need not address defendant's lack of sleep, the mere fact that a person has been without sleep for an extended period of time, prior to making a statement, does not render it automatically involuntary. (*People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7; *People v. Byrd* (1980), 90 Ill. App. 3d 429, 413 N.E.2d 148; *People v. Newman* (1966), 66 Ill. App. 2d 321, 214 N.E.2d 333.) The mere fact that an accused is emotionally upset does not render his statements involuntary. (*People v. Pawlicke* (1978), 62 Ill. App. 3d 791, 379 N.E.2d 798; *People v. Merkel* (1974), 23 Ill. App. 3d 298, 319 N.E.2d 77.) Here, the trial court's determination that defendant's statements at the police station were voluntary and that he voluntarily waived his *Miranda* rights is supported by the evidence.

 Defendant next argues that the imposition of a natural-life sentence plus costs and a fine constitutes cruel and unusual punish-

ment. Defendant maintains that no evidence of his net worth is in the record and that the statutory lien on his property is inconsistent with the presumption of innocence. Defendant asserts his post-trial motion preserved review of the sentencing issues. Initially, we note that defendant does not support his argument by citation to any authority. He merely makes his assertions and goes on. The appellate court need not address issues which are presented in such a form. (*People v. Deacon* (1985), 130 Ill. App. 3d 280, 473 N.E.2d 1354, *cert. denied* (1985), 474 U.S. ____, 88 L. Ed. 2d 260, 106 S. Ct. 253.) Defendant has waived review of this claim.

In defendant's post-trial motion, he did not contest the sentence. In his amended post-trial motion, defendant did not challenge the constitutionality of his natural-life sentence or the imposition of costs or fine on any basis. In paragraphs 50 and 52 of his amended post-trial motion, defendant makes a very general allegation claiming to preserve any and all errors in the record. Absent plain error, issues not raised at trial or in a post-trial motion are waived. (*People v. Davis* (1982), 93 Ill. 2d 155, 442 N.E.2d 855; *People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091; *People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 277; *People v. Howard* (1982), 107 Ill. App. 3d 936, 438 N.E.2d 580; *People v. Horn* (1978), 64 Ill. App. 3d 717, 381 N.E.2d 790.) Waiver concepts apply to constitutional as well as nonconstitutional issues. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) A post-trial motion which contains only general allegations is insufficient to properly preserve a matter for review. (*People v. Smylie* (1981), 103 Ill. App. 3d 679, 685-86, 431 N.E.2d 1130, 1135; *People v. Goble* (1976), 41 Ill. App. 3d 491, 499, 354 N.E.2d 108, 115; *People v. Rogers* (1975), 32 Ill. App. 3d 788, 790, 336 N.E.2d 784, 785.) Defendant has waived review of the sentencing issues.

 Defendant next argues that the trial court erred in restricting his cross-examination of the models to show bias. Defendant has waived review of this issue by failing to raise it in his post-trial motion. (*People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091; *People v. Smylie* (1981), 103 Ill. App. 3d 679, 431 N.E.2d 1130; *People v. Goble* (1976), 41 Ill. App. 3d 491, 354 N.E.2d 108.) On the merits, defendant's assertion is not well-taken. The record supports that the models' testimony was not influenced by the prosecution.

 Finally, defendant argues that Judge Baner was biased against him, because Baner ultimately ruled the motive evidence was admissible, followed Judge Knecht's earlier rulings that the State need not reveal its motive strategy in discovery, and unduly relied upon appellate review. A general allegation of error in a post-trial

motion is insufficient to preserve a matter for review. (*People v. Smylie* (1981), 103 Ill. App. 3d 679, 431 N.E.2d 1130; *People v. Rogers* (1975), 32 Ill. App. 3d 788, 336 N.E.2d 784.) This was a lengthy trial. During its course, the trial court made many rulings. The post-trial motion allegation by not specifying which ruling it is referring to, in effect, precluded the trial court from considering whether error had occurred. This is in opposition to the purpose of a motion for a new trial. (*People v. Rogers* (1975), 32 Ill. App. 3d 788, 336 N.E.2d 784.) Additionally, we note that defendant's contentions are not supported by the record.

For the above reasons, we affirm the trial court.

Affirmed.

GREEN and SPITZ, JJ., concur.